755 So.2d 1158 (1999)
Sherry SWINDLE, Appellant,
v.
STATE of Mississippi, Appellee.
No. 98-KA-00107-COA.
Court of Appeals of Mississippi.
June 8, 1999.
Rehearing Denied September 14, 1999.
Certiorari Denied November 18, 1999.
*1161 Thomas D. McDonough, New Albany, Attorney for Appellant.
Office of the Attorney General by W. Glenn Watts, Attorney for Appellee.
BEFORE THOMAS, P.J., LEE, AND SOUTHWICK, JJ.
THOMAS, P.J., for the Court:
¶ 1. Sherry Swindle appeals her conviction of manslaughter, raising the following issues as error:
I. THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE THE WRITTEN STATEMENT OF A WITNESS WHO HAD ALREADY TESTIFIED.

*1162 II. THE TRIAL COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION FOR DISMISSAL PURSUANT TO THE 270-DAY RULE.
III. THE COURT ERRED IN REFUSING THE DEFENDANT'S MOTION FOR CONTINUANCE TO PERMIT THE DEFENDANT TO CONDUCT ADDITIONAL TESTS ON THE BLOOD OF THE DECEASED, INVESTIGATE AND EVALUATE THE KNIFE, AND TO OBTAIN THE PRESENCE OF A CRUCIAL WITNESS.
IV. THE TRIAL COURT ERRED IN REFUSING THE DEFENDANT'S MOTION FOR MISTRAL DUE TO THE IMPROPER CLOSING ARGUMENT OF THE PROSECUTION.
V. THE TRIAL COURT ERRED IN LIMITING THE DEFENDANT'S PROOF ON THE KNOWN AGGRESSIVE NATURE AND MENTAL CONDITION OF THE DECEASED.
VI. THE TRIAL COURT ERRED IN REFUSING TO PERMIT THE DEFENDANT TO SHOW THAT SHE HAD COOPERATED WITH LAW ENFORCEMENT DURING THE INVESTIGATION.
VII. THE COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION FOR DISMISSAL AT THE CLOSE OF THE STATE'S CASE AND/OR THE VERDICT OF THE JURY WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
VIII. THE COURT ERRED IN REFUSING JURY INSTRUCTION D-16 AND D-17 THEREBY PREVENTING THE DEFENDANT FROM PRESENTING THOSE THEORIES OF DEFENSE.
IX. THE DEFENDANT WAS PREJUDICED BY THE FAILURE OF THE STATE TO PRODUCE PHYSICAL EVIDENCE.
¶ 2. Finding no reversible error, we affirm.

FACTS
¶ 3. On the morning of January 3, 1996, Chris Little stopped by Eric Allen's house, a person he worked with and had known for twenty-five years. They decided to drive around and some time before lunch they stopped at Barbara Thomas's trailer. Thomas, Thomas's eleven-year-old son, Shane Thomas, Freddie Wilde, and Sherry Swindle were all at the trailer when Little and Allen arrived. Little and Allen stayed at Thomas's trailer for a short time, talking and watching television. Little and Allen eventually left, and Little dropped Allen back at his home.
¶ 4. Later that same day sometime in the early evening, Little returned to Allen's house, and they drove back to Thomas's trailer. This time Rhonda Stewart, an ex-girlfriend of Little, was at the trailer. Stewart left immediately upon seeing Little as she did not want any trouble. Little had been very depressed over his breakup with Stewart and had even tried to commit suicide. Little and Allen soon left also, only to return an hour later. During the hour they were away, Little and Allen purchased two quarts of beer and a pint of whisky and were driving around while drinking.
¶ 5. Upon arriving back at the trailer, Little got in an argument with Wilde over a pool cue Wilde had borrowed from Little. Little went outside and began searching Wilde's car for the cue and tried to start the car. Wilde came out of the trailer, and the argument soon erupted into a fight. Allen stood by as the two men fought on the ground. Thomas and Swindle soon came out of the trailer. Little began scuffling *1163 with all three. Thomas returned to the trailer and came back brandishing a pistol. Little grabbed the pistol out of Thomas's hand and aimed it at Wilde, who was still on the ground. Little then moved the pistol to one side and fired into the ground. Thomas ran back toward the trailer. Little pointed the gun at her and then moved it to one side and fired. Swindle fled the scene. Little then pointed the gun back at Wilde and again moved it to the side and fired at the ground.
¶ 6. After the third shot, Allen went up to Little and asked for the gun. Little handed the gun over to Allen who then walked up the steps of the porch of the trailer and handed it to Thomas just inside the door. Allen then walked down off the porch and said to Little who was standing at the base of the stairs "come on; let's go." At that moment Swindle, carrying the gun, came running out onto the porch and yelled "you son of a bitch." Swindle began firing the pistol at Little. Little was struck by the gunfire and fatally wounded.
¶ 7. An autopsy showed that Little had been shot a total of four times, once on the big toe of the right foot, once on the left shoulder, once on the left chest, and once on the top of the head. A blood sample taken from the victim, showed that he had a blood alcohol content of .23 percent. Investigating officers also found a half-opened knife at the feet of Little.
¶ 8. Swindle was indicted for manslaughter. Trial was commenced on November 12, 1997. The defense wanted Wilde to testify and twice asked that he be subpoenaed, but he could not be found at the time of trial. However, Thomas did testify for the defense. Thomas testified that Little and Allen came to her trailer. Thomas stated that Little was drunk and out of control. She testified that Little and Wilde soon got into an argument over a pool cue and that this argument escalated into a fight when Little broke a beer bottle and went with it at Wilde.
¶ 9. Thomas further testified that both she and Swindle tried to intervene and were struck by Little. At this point, Thomas said she started back to her trailer to call 911, but then told her son to call as he was still outside, and she wanted him in the trailer. Thomas stated that she then got her gun in an attempt to scare Little to get him to leave. She stated that she was standing on the porch of the trailer with the gun at her side when Little charged her taking the gun away and dragging her by the hair down the steps. Thomas testified that Little placed the gun to her head and fired, but the gun failed to go off. She further testified that Little shot at her twice more with the gun discharging, once between her chest and arm and once at her legs.
¶ 10. Little then returned his attention back to Wilde and was on top of him hitting him with both fists. Thomas testified that she again tried to get Little off of Freddie, but that she was slung to the ground. Thomas said she then screamed for Swindle to come help her as Little was "killing" Wilde. Thomas stated that she was trying to make it back into the trailer when Swindle and Shane came out onto the porch. Thomas testified that Swindle now had the gun in her hands, but that she did not know how Swindle got the gun. Thomas stated that Swindle told Little to get off Wilde, but that he did not even look up. Swindle then fired the gun. Little then charged at Swindle, Thomas, and her son. Thomas testified that Swindle shot a couple of more times as Little charged. Thomas said she did not know if Little was hit or not. Thomas said her only thought was to get her son in the trailer. Once inside, Thomas stated that she, her son, and Swindle locked the door of the trailer and then locked themselves in the bathroom. Thomas stated another call was placed to 911, and she took the gun and reloaded it. Thomas stated she sat there in the bathroom with the gun in one hand and her son in the other while she waited for the police to arrive.
*1164 ¶ 11. After deliberations, the jury returned a verdict of guilty. Aggrieved, Swindle perfected this appeal.

ANALYSIS

I.

THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE THE WRITTEN STATEMENT OF A WITNESS WHO HAD ALREADY TESTIFIED.
¶ 12. Allen was called as the chief prosecution witness. During cross-examination, Allen was repeatedly questioned about inconsistencies between his trial testimony and his statement given to police the night of the incident. On redirect, the prosecution, over repeated objections by the defense, was allowed to introduce into evidence Allen's statement. Swindle now argues that it was reversible error to allow Allen's statement into evidence because it was hearsay and constituted improper bolstering of the witness.
¶ 13. Our supreme court has held:
This Court has held that admission of a prior consistent statement of a witness where the veracity of the witness has been attacked is proper but "should be received by the court with great caution and only for the purpose of rebuttal so as to enable the jury to make a correct appraisal of the credibility of the witness." [Stampley v. State, 284 So.2d 305, 307 (Miss.1973).] In Stampley, the witness, an accomplice of the defendant, was impeached by the defendant and, on re-direct, was "bolstered" by testifying he had given a statement to the police inculpating the defendant. Id. at 306-07. The Court held that because the witness had been impeached by prior inconsistent statements and either denied or explained those statements, examination regarding prior consistent statements on redirect was admissible. Id. at 307-08.
White v. State, 616 So.2d 304, 308 (Miss. 1993).
¶ 14. Furthermore, our supreme court has held that "[e]vidence of prior consistent statements made by the witness is not evidence of the fact testified to by the witness, but may be offered for the sole purpose of supporting the testimony of the witness whose veracity has been attacked." Stampley, 284 So.2d at 307.
¶ 15. In the case sub judice, the defense attacked the veracity of Allen with his statement. Once this was done, the prosecution was properly allowed to introduce Allen's statement for the sole purpose of supporting Allen's testimony whose accuracy had been challenged. The trial court allowed Allen's statement into evidence but only for the limited purpose of determining the credibility of the witness as is evidenced by Jury Instruction No. S-3 which stated "THE COURT instructs the jury that the written statement of witnesses in evidence are for the purpose of determining the credibility of the witnesses and not to be considered as substantive evidence." This issue is without merit.

II.

THE TRIAL COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION FOR DISMISSAL PURSUANT TO THE 270-DAY RULE.
¶ 16. Swindle argues that her right to be tried no later than 270 days after being arraigned, as guaranteed by Miss. Code Ann. § 99-17-1 (Rev.1994) was violated. Swindle argues that she was prejudiced by her delay in being brought to trial in several ways. First, a crucial defense witness, Wilde, available during the entire delay became unavailable shortly before trial as he went to visit relatives in North Carolina and could not be found at the time of trial. Secondly, Swindle maintains that during the delay she suffered a ruptured brain aneurysm which required surgery, and that her ability to recall facts and details of the incident have been affected, *1165 thus contributing to her decision not to testify. Finally, Swindle maintains that evidence could not be obtained from the knife which was only revealed to the defense about twelve days prior to trial. Swindle also argues that her constitutional right to a speedy trial, as guaranteed by the Sixth Amendment to the United States Constitution, was also violated. Swindle bases her argument on a reading of Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Swindle argues that since both her statutory and constitutional right to a speedy trial was violated she is entitled to have the charges against her dismissed. We conduct a separate analysis of each consideration because the statutory right to a speedy trial attaches at a different period than the constitutional right.
¶ 17. Swindle waived arraignment and entered a plea of not guilty on September 3, 1996, thus starting the statutory speedy trial clock. Swindle was not tried until November 12, 1997, some 425 days after waiving her arraignment. Miss.Code Ann. § 99-17-1 (Rev.1994) reads as follows:
Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.
With regard to this statute our supreme court has stated:
Where the accused is not tried within 270 days of his arraignment, the State has the burden of establishing good cause for the delay since the accused is under no duty to bring himself to trial. Nations v. State, 481 So.2d 760 (Miss. 1985). Continuances for "good cause" toll the running of the 270-day period, unless "the record is silent regarding the reason for the delay," and then "the clock ticks against the Sate because the State bears the risk of non-persuasion on the good cause issue." Vickery v. State, 535 So.2d 1371, 1375 (Miss. 1988).... Continuances that are attributed to the defendant stop the running of the clock and are deducted from the total number of days before trial. Vickery, 535 So.2d at 1376.
Herring v. State, 691 So.2d 948, 953 (Miss. 1997).
¶ 18. Our supreme court has also held that although the State has the burden of establishing "good cause" for the delays this does not mean that expressions of cause need to be made contemporaneously with the delay. McGee v. State, 608 So.2d 1129, 1133 (Miss.1992). "Post-delay determinations of cause are permissible and, when supported by substantial credible evidence, shall not be overturned." Hull v. State, 687 So.2d 708, 729 (Miss. 1996) (citing McNeal v. State, 617 So.2d 999, 1007 (Miss.1993); Folk v. State, 576 So.2d 1243, 1247 (Miss.1991); McGee, 608 So.2d at 1132).
¶ 19. The record demonstrates that the day before trial Swindle's motion to dismiss for speedy trial violation was heard. The hearing revealed that Swindle asked for and received continuances on March 14, 1997, and on September 5, 1997. The record is unclear what trial dates were set after these continuances. However, the fact Swindle asked for the second continuance can only mean that Swindle was not prepared to go to trial on September 5, 1997, and that the trial date after the first continuance must have been on that date or soon after. A total of 176 days elapsed from March 14, 1997, to September 5, 1997. Since this delay is attributable to Swindle, it will toll the running of the speedy trial clock. Subtracting 176 days from the total of 435 days leaves 259 days. Therefore, Swindle was brought to trial within the meaning of the statute and her statutory speedy trial rights were not violated.
¶ 20. Swindle's constitutional right to a speedy trial is weighed under the factors established by the United States Supreme Court in Barker, 407 U.S. *1166 at 530-32, 92 S.Ct. 2182. The Barker factors read as follows:
(1) the length of the delay;
(2) the reason for the delay;
(3) the defendant's assertion of his right to a speedy trial; and
(4) whether any prejudice resulted to the defendant as a result of the delay.
Id.
We are also mindful that when evaluating these factors that:
No mathematical formula exists according to which the Barker weighing and balancing process must be performed. The weight to be given each factor necessarily turns on the quality of evidence available on each and, in the absence of evidence, identification of the party with the risk of nonpersuasion. In the end, no one factor is dispositive. The totality of the circumstances must be considered. We are mindful indeed that no one factor is dispositive of the question. Nor is the balancing process restricted to the Barker factors to the exclusion of any other relevant circumstances.
McGhee, 657 So.2d at 801-02 (citing State v. Magnusen, 646 So.2d 1275, 1278 (Miss. 1994)).
¶ 21. We will first address the length of delay. The constitutional speedy trial clock begins to run from the date of arrest. McGhee, 657 So.2d at 802. Furthermore, a delay of eight months or longer is presumptively prejudicial. Herring, 691 So.2d at 955. Swindle was arrested on January 3, 1996, and was tried on November 12, 1997. Since Swindle was not brought to trial within eight months, the delay is presumptively prejudicial, thus this factor favors Swindle.
¶ 22. Next, we will address the reasons for delay. As stated above, Swindle asked for two continuances significantly delaying her trial. In addition, the record shows no action by the State to deliberately delay or impede Swindle's trial for its own tactical advantage or to undermine the defense's resources. When the record is devoid of any bad faith on the part of the State, coupled with valid reasons for the delay then this factor will not weigh heavily against the State. Duplantis v. State, 708 So.2d 1327(¶ 19) (Miss.1998).
¶ 23. Next, we will look at the time Swindle asserted her right to a speedy trial. Swindle never asked for or demanded a speedy trial. Swindle merely filed a demand for dismissal on November 4, 1997. A motion for dismissal is not the equivalent of a demand for a speedy trial. Perry v. State, 637 So.2d 871, 875 (Miss. 1994). This factor weighs in favor of the State.
¶ 24. Finally, we must look at any actual prejudice to Swindle as a result of the delay. Swindle alleges several reasons why she was prejudiced as a result of the delay. Swindle alleges she was prejudiced because Wilde who was available during the entire delay became unavailable shortly before trial as he went to visit relatives in North Carolina and could not be found at the time of trial. The record shows that Swindle requested that Wilde be subpoenaed on October 31, 1997 and again on November 5, 1997, but that he was never served. The sheriff contacted Wilde by phone, and was assured by Wilde that he would be at trial. Wilde also told the defense by telephone he would be at trial. Even with these assurances, Wilde failed to show at trial.
¶ 25. Swindle never proffered anything at trial describing Wilde's potential testimony, other than saying that the defense anticipated Wilde to testify "if Sherry hadn't shot him, he would have killed us all." This statement was made in Swindle's oral motion for a continuance and no written motion or supporting affidavit was filed as required under Miss.Code Ann. § 99-15-29 (Rev.1994). Also, Thomas testified for the defense stating in essence the same thing that Wilde would have potentially testified about, namely that she was afraid Little was going to "kill us all." Thomas's testimony even went further *1167 when she testified that Little placed the gun barrel to her head and pulled the trigger, but the gun failed to fire. We only have the one statement describing Wilde's testimony which is cumulative to the testimony received from Thomas.
¶ 26. Furthermore, accepting as true that Wilde was available to testify the entire time until shortly before actual trial, the fact remains that if Swindle would not have asked for a continuance on March 14, 1997, Wilde would have been available for trial. We will not hold that Swindle was prejudiced by the absence of a witness under all these circumstances.
¶ 27. Swindle maintains that during the delay she suffered a ruptured brain aneurysm. Swindle may have suffered loss of memory because of her condition, but it was in no way caused or exacerbated by the State. Also, we have nothing evidencing Swindle's alleged loss of memory, such as reports or testimony from experts, except Swindle's testimony taken outside the presence of the jury. Furthermore, the record shows that Swindle suffered the aneurysm on July 1, 1997. Again, if Swindle had not asked for a continuance on March 14, 1997, she would have been tried before her aneurysm.
¶ 28. Finally, Swindle maintains that evidence could not be obtained from the knife. However, the record shows that the knife was recovered the night of the incident or the next day, put in an envelope and sealed. Although the defense did not learn of the knife until some twelve days before trial, it was still analyzed and no blood or fingerprints found. Furthermore, no witness testified that Little wielded the knife on the night in question, although Thomas did testify that the knife belonged to Little. This factor has little weight in favor of Swindle.
¶ 29. Having reviewed all of the Barker factors in their entirety, and after reviewing the total circumstances of this case, we conclude that Swindle was not denied her constitutional right to a speedy trial. Since the statutory speedy trial clock was tolled by Swindle's own continuances and there was no constitutional violation to a speedy trial it was proper of the trial court to deny Swindle's motion to dismiss. This assignment of error is without merit.

III.

THE COURT ERRED IN REFUSING THE DEFENDANT'S MOTION FOR CONTINUANCE TO PERMIT THE DEFENDANT TO CONDUCT ADDITIONAL TESTS ON THE BLOOD OF THE DECEASED, INVESTIGATE AND EVALUATE THE KNIFE, AND TO OBTAIN THE PRESENCE OF A CRUCIAL WITNESS.
¶ 30. Swindle asked for a continuance on November 12, 1997, the day of trial. As stated above, this was an oral request for continuance, and no supporting affidavits were filed as required under Miss.Code Ann. § 99-15-29 (Rev.1994). Swindle alleged that she needed more time to test Little's blood for LSD and PCP as the day before a witness expressed surprise that Little's blood had turned up negative for drugs because the witness believed he was using "acid." Swindle also wanted more time to investigate the knife, especially whether the two year delay in having the knife tested for fingerprints and blood would make any test on the knife less reliable than if it were conducted soon after the incident. Finally, Swindle alleged she needed more time to procure the presence of Wilde as he was a crucial witness. On appeal, Swindle reiterates the same reasons for the need of a continuance.
¶ 31. Miss.Code. Ann. § 99-15-29 (Rev.1994) provides that a court "may grant or deny a continuance, in its discretion," and that a denial of a continuance "shall not be grounds for reversal unless the Supreme Court shall be satisfied that injustice resulted therefrom." In order for us to reverse, Swindle must show that a manifest injustice resulted from the denial *1168 of the continuance. Lambert v. State, 654 So.2d 17, 22 (Miss.1995).
¶ 32. We hold the trial court did not abuse its discretion in this instance. First, Swindle did not follow the proper statutory procedure for a continuance. Furthermore, the record shows that on January 5, 1996, Swindle had taken a tape-recorded conversation with the witness who claimed Little used "acid" in which the witness claimed she knew nothing of Little using drugs. Also, the record shows that other than the alcohol, Little's blood tested negative for six commonly abused drugs. The record further shows that the knife was tested and no fingerprint or blood evidence was found. Finally, Swindle only claimed in her oral motion for continuance that Wilde would testify that Little would have killed everyone had it not been for Swindle. At the time of the motion Thomas was present and prepared to testify to the same facts. Under such circumstances we hold that the trial judge did not abuse his discretion in denying the continuance.

IV.

THE TRIAL COURT ERRED IN REFUSING THE DEFENDANT'S MOTION FOR MISTRIAL DUE TO THE IMPROPER CLOSING ARGUMENT OF THE PROSECUTION.
¶ 33. During closing argument by the State the following comments were made:
You heard a lot of testimony, and there's been disputing testimony. You have heard all the testimony you're going to hear. There's not going to be any more testimony. We're just going to have our statement. I'm not going to have a lot of argument. I'm going to save the argument for those two guys coming along behind me. I'm going to point out some facts to you.

Not only do you have [to] hear the testimony of what you have heard, but you have to [hear] what you haven't heard also. You heard some things for the first time today, yesterday, or the day before. It's your decision to decide who's believable. You basically have two versions of what happened out there that night. You've heard two witnesses there. You heard from Eric Allen and Barbara Thomas. It's going to be y'alls decision to decide who you believe. Do you believe Eric Allen or do you believe Barbara Thomas?
. . .

There are only two versions of the story, Eric Allen's story and Barbara Thomas' story. Barbara Thomas told you Sherry Swindle was on the porch. Eric Allen and Freddie were over here.
. . .
Just as I told you about the gun, about the knife, the broken bottle, and somebody sticking a gun to your head and snapping it, does she say anything about it that night? No.
Her niece, Sherry Swindle, a year and a half ago or so, they know they've got to prove a case of self-defense. She killed him, and it wasn't self-defense. She's guilty, and how do you do that? You put a weapon in their hand. If you don't get the first weapon in, the bottle, you go with the knife. If you don't get the bottle in, you attack this victim as bad as possible.
. . .
Do you believe that that is true, that she shot over here while he was down on top of somebody; and she happened to hit the right one; when shot in any one of those three places: top of the head, dead through the heart, or all the way through the arm, through both lungs, and into the liver, that Chris Little jumped up and started charging her? Do you believe that? That's what you're going to have to believe to believe Barbara Thomas' statement.
I don't care which one of those shots he received last. I submit to you if you get any of those, you don't jump up and *1169 run all this distance over here. Barbara Thomas' statement is not believable.
Eric Allen's statement is believable. You'll have his statement back there. You can look at it. He says they were getting up.

One thing I told you to consider other than what you hear is what you [do] not hear. There is only one version by Eric.

. . .
You heard no testimony other than Eric Allen's statement as to how that gun got back in the house.
. . .

Nobody said anything about a bottle. Nobody said anything about a knife. Nobody said anything about holding the gun to their head and pulling the trigger and snapping it. It's not reasonable.
. . .
The only other witness that you have to balance what Eric said against is Barbara Thomas, a relative.
. . .
Barbara, all she said is he was coming at her. Taking her statement, just concentrate for a moment before the fire came out of the gun. That's all she can tell you. That's all the evidence that there is other than Tom trying to testify. He was doing all this stuff, running at her, and all this. That's all.
(emphasis added).
¶ 34. Swindle alleges that these comments were improper references to her right not to testify. However, Swindle only objected to one of these comments, namely where the State remarked "[o]ne thing I told you to consider other than what you hear is what you not hear. There is only one version by Eric." At that point, Swindle objected and asked for a mistrial for improper reference about her failure to testify. The objection was overruled. On all other comments Swindle failed to make an objection. Failure to make a contemporaneous objection at trial waives the issue on appeal. Holland v. State, 656 So.2d 1192, 1197 (Miss.1995) (citing Ratliff v. State, 313 So.2d 386, 388 (Miss.1975)). We therefore only address the comment which had a contemporaneous objection.
¶ 35. To better understand the comment it must be shown it its full context:
I don't care which one of those shots he received last. I submit to you if you get any of those, you don't jump up and run all this distance over here. Barbara Thomas' statement is not believable.
Eric Allen's statement is believable. You'll have his statement back there. You can look at it. He says they were getting up.
One thing I told you to consider other than what you hear is what you not hear. There is only one version by Eric.
BY MR. MCDONOUGH: Objection, your Honor.
BY THE COURT: Approach, please.
(The following bench conference was held:)
BY THE COURT: What's your objection?
BY MR. MCDONOUGH: He just said you've got to consider what you did not hear, one version presented by Eric. That's an absolute comment on her failure to testify.
BY THE COURT: The objection is overruled.
BY MR. MCDONOUGH: We ask for a mistrial.
BY THE COURT: Motion for mistrial is overruled.
(End of bench conference.)
BY THE COURT: You may continue.
You heard no testimony other than Eric Allen's statement as to how that gun got back in the house. If Eric Allen is not telling you the truth, how did Sherry Swindle get that gun in her *1170 hand? We all know Barbara had it first. We all know Chris took it away from her. We all know Chris shot it. How did it get back to Sherry if Eric didn't tell you the truth? There is no way.
¶ 36. Only two people who witnessed the events in question testified, namely Allen and Thomas. Allen testified that he got the gun from Little and returned it to Thomas inside the trailer. Thomas testified she had no idea how Swindle got the gun or how it got back into the trailer. The State comments were not directed to Swindle's failure to testify but were instead directed to the fact that the State presented the only evidence which showed how Swindle came in possession of the gun. This assignment is without merit.

V.

THE TRIAL COURT ERRED IN LIMITING THE DEFENDANT'S PROOF ON THE KNOWN AGGRESSIVE NATURE AND MENTAL CONDITION OF THE DECEASED.
¶ 37. Swindle argues that this was a case of who was the aggressor, and that was the paramount question to be answered by the jury. Swindle argues that since the character of the victim, namely his aggressive behavior, was central to her self-defense claim she had a right to introduce evidence of Little's violent character under M.R.E. 404(a)(2). Swindle maintains that her attempts to introduce Little's history of violent physical attacks were not allowed by the court. Furthermore, Swindle argues that the court severely limited her introduction of evidence which showed that Little had been extremely depressed over his breakup with Stewart, and that he was suicidal. Swindle maintains that it was reversible error not to have allowed her to introduce this evidence.
¶ 38. With regard to character evidence where the defendant claims he acted in self-defense, our supreme court has stated:
The general rule is that character evidence may not be admitted to prove action in conformity therewith. Rule 404, M.R.E. However, Rule 404(a)(2) specifically authorizes inquiry by a criminal defendant into a victim's character. This exception enables defendants to prove that the victim was the initial aggressor and that the defendant acted in self-defense. Comment, Rule 404, M.R.E. Once Rule 404 has been satisfied, character evidence in the form of opinion or reputation evidence is admissible without further restriction. Rule 405(a), M.R.E. However, when character evidence passes through Rule 404(a)(2), and is offered in the form of specific instances of conduct, it is admissible only on cross-examination. Rule 405(a).... However, specific instances of conduct in cases where character or the trait of character is "an essential element of a charge, claim, or defense...." are admissible whether on cross or direct examination. Rule 405(b). According to Heidel v. State, 587 So.2d 835 (Miss.1991), past acts are admissible in cases where a defendant alleges self-defense, concluding that the character trait of violence was an "essential element" of the defense under 405(b). Heidel, 587 So.2d at 843-47.
Newsom v. State, 629 So.2d 611, 613-14 (Miss.1993).
¶ 39. In the case sub judice, Swindle's defense was that Little, upon seeing his former girlfriend, became depressed, began drinking, became violent, and when he returned to the trailer Swindle acted in self-defense. Therefore, Little's propensity for violence, state of mind regarding depression and suicide, as well as Swindle's knowledge of Little's violent character were all relevant and competent evidence that should have been admitted.
¶ 40. The State made a motion in limine to prohibit reputation or character evidence of Little. The trial court granted the State's motion precluding this evidence "until there is some evidence of some overt *1171 act toward the defendant." The trial court was correct in that such evidence is not allowed until such time that there is evidence that the victim had been the aggressor in the affray. McDonald v. State, 538 So.2d 778, 779 (Miss.1989). However, at the point when the motion in limine was made, Allen, the State's own witness, had already testified that Little had fought with Wilde, had been pointing and shooting the gun at various individuals, and had scuffled with both Thomas and Swindle. This evidence should have been allowed at that point.
¶ 41. After granting the motion, the trial court then sustained frequent objections to this type of evidence. However, we are not required to reverse a case based solely on an evidentiary ruling. Newsom, 629 So.2d at 614. Only when a substantial right of the defendant is denied is reversal required. Id. In this case, Swindle's right to a fair trial, a constitutional right, is being effected. Id. Therefore, reversal is required unless "on the whole record, the error was harmless beyond a reasonable doubt." Id. (quoting Hoover v. State, 552 So.2d 834, 840 (Miss. 1989)).
¶ 42. Although, as stated above, the trial court sustained numerous objections to the introduction of this character evidence, inexplicably many objections were overruled. Also, the State failed to even make objections in some instances. The following testimony was presented to the jury during the defense's cross-examination of Allen despite objections by the State or because of the lack of an objection by the State:
Q. You've known Chris for 25 years.
A. Yes, sir.
Q. Y'all were buddies.
A. Yes, sir.
Q. Is it fair to say y'all were drinking buddies?,
A. Just buddies.
Q. Drinking buddies.
A. No, sir.
Q. You didn't ever go out drinking.
A. Occasionally.
. . .
Q. All right, when you went out there about 7:00 or 8:00, Rhonda was there. Rhonda was Chris' former girlfriend.
A. Yes, sir.
Q. He was awfully tore up about breaking up with Rhonda.
A. He didn't mention anything about it.
Q. He tried to kill himself over it, didn't he?
A. Not that I'm aware of.
Q. You don't remember Chris trying to kill himself?
A. No, sir.
Q. You don't remember him being in the hospital?
A. (Witness shook head from side to side.)
Q. I'm talking about like two or three months prior to his death he attempted suicide, and you're not aware of that.
A. No, sir.
BY MR. HOOD: Your Honor, that question has been asked and answered three times.
BY THE COURT: Overruled. He's on cross examination.
. . .
Q. Would you describe Chris as a happy person, sad person?
A. Happy.
Q. Cheerful person.
A. Yes, sir.
Q. Not often depressed.
A. No, sir.
Q. Was he depressed that night?
A. Pardon me?
Q. Was he depressed that night?
A. He didn't mention it, no.
. . .

*1172 Q. Did Chris have a bad temper?
A. No more so than anybody else.
Q. Did you ever see him really, really angry?
A. I've seen him angry.
Q. Did you ever see him irrationally angry?
A. No, sir.
. . .
Q. Chris was fixing to whip him, and you knew that. Chris liked to do that.
A. I wouldn't say that.
Q. Have you seen him whip anybody before?
A. No, sir.
¶ 43. The defense called Thomas to the stand, and the following testimony was presented to the jury despite protests by the State:
Q. And what was their condition at that time?
A. I don't know what condition Eric was in, but Chris was wild.
Q. What do you mean by wild?
A. He was in a bad state of mind.
Q. Was he drunk?
A. Yes, sir, very.
Q. Significantly more drunk than he was an hour earlier?
A. Yes, sir.
Q. What else can you tell us about him, his appearance, demeanor? How was he at that point?
A. Uncontrollable, wild.
Q. Had you ever seen him like that before?
A. I had seen him but not quite that bad.
Q. Did he sometimes get like that when he drank?
BY MR. HOOD: Objection, your Honor.
BY THE COURT: Overruled.
BY MR. HOOD: I would like to approach, if I may.
BY THE COURT: Overruled.
Q. Did he sometimes get like that when he drank too much?
A. Not to that extent, or I had never seen him to that extent.
. . .
Q. The first time he came out to y'alls house about 7:30, did he see Rhonda?
A. Yes, sir.
Q. Had he recently broken up with Rhonda?
A. They broke up April of '95.
Q. Did he change his demeanor, his attitude, his mood upon seeing Rhonda that day?
BY MR. HOOD: Your Honor, objection. There again, it's irrelevant.
BY THE COURT: I'm going to let her answer that question.
A. Did he change his mood that day?
Q. When he saw Rhonda.
A. No, not really.
. . .
Q. Had you expressed to Sherry at any point reasonably soon before this that you were concerned about Chris?
A. Yes, sir.
Q. I mean had you expressed to Sherry that Chris was capable of being
BY MR. HOOD: Your Honor, I object to leading this witness.
BY MR. MCDONOUGH: How do I get into that, your Honor, without just asking?
BY THE COURT: Overruled.
Q. Had you expressed to Sherry any concern about the fact that Chris might become aggressive?
A. Like violent?
Q. Yeah.
A. No. I never thought he would, not toward me.
Q. Had you expressed to Sherry that he sometimes became angry?
A. I'm not sure if I had or not.

*1173 Q. But you and Sherry talked a lot about Chris.
A. Yes, sir.
Q. You had asked him to not live there any more recently.
BY MR. HOOD: Your Honor, Mr. McDonough is attempting to testify for this witness.
BY THE COURT: Don't leave [sic] her Mr. McDonough.
Q. How did he react when you told him you didn't want him to live there anymore?
A. He got mad.
Q. Did he keep coming out there?
A. Yeah.
Q. Did you want him to keep coming out there?
A. No, sir.
Q. Had you expressed to Sherry that you were concerned about him coming on out there?
A. He was beginning to scare me a little.
Q. Had you expressed that fear to Sherry?
A. Probably, not that I thought he would be violent, that violent toward me or anything; because I didn't really think that.
¶ 44. The defense also called Stewart who testified, over the objections of the State, as follows:
Q. Ms. Stewart, did you know Chris Little?
A. Yes, sir.
Q. How did you know him?
A. We used to live together.
Q. Over what time period?
A. From '93 to about '90the first of April of '96. Well, it may have been '95.
Q. He died in January of '96. It would have been the April right before.
A. Yeah.
Q. Y'all broke up, right?
A. Yes, sir.
Q. Did y'alls breakup adversely affect him?
BY MR. HOOD: Objection, your Honor. He's attempting to slaughter the victim's character, I believe.
BY THE COURT: Overruled. Let's see where it's going.
A. Say it again.
Q. How did y'alls breakup affect him?
A. He was depressed about it. He told a bunch of people he made a mistake. He was depressed.
. . .
Q. On the day that he died, the first time he went to Barbara's house was about 7:30, 8 o'clock p.m., something like that.
A. I would say it was more like 5:30 or 6:00 when I was there.
Q. You were there.
A. (Witness nodded head and up down.)
Q. Did you see him?
A. Yes, sir.
Q. How did he react when he saw you?
A. He had a crazy look in his eye. I didn't see nothing. I left right after he come in.
Q. Why did you leave?
A. Because I didn't want no confrontation.
Q. Did seeing you seem to affect him emotionally?
A. I would say so.
Q. Okay. Had he had negative emotional problems after y'alls breakup?
A. Yes, sir.
BY MR. HOOD: Objection, your Honor, relevance.
BY THE COURT: I'm going to see if he can qualify it. Overruled.
Q. At the time he attempted suicide was that, in your opinion, over y'alls breakup?

*1174 A. It was stated when they found him, he was taking pictures of me and cutting them up.
Q. And the next time he saw you after that was this night.
A. I would say so.
Q. You think it affected him to see you or not?
A. I would say so.
. . .
Q. Did you and Sherry ever have a discussion about any concerns you had about Chris and his temper?
A. Yes, sir.
Q. What did you express to Sherry about his temper?
A. That he could go off and go crazy.
Q. Had you ever seen him go crazy, as you call it, before?
A. Yes, sir.
Q. On what previous occasions?
BY MR. HOOD: Objection, your Honor. I don't believe he's laid the proper predicate.
BY THE COURT: Overruled. I'm going to let her testify to that.
A. He beat me up one time, well, two times.
Q. On those occasions did he seem to be out of control?
A. Yes, sir.
Q. What was his demeanor or attitude when he would do that?
A. Just, I mean it was just a split second. I didn't know what was going to happen. He would come after me.
¶ 45. We hold that any error committed was harmless beyond a reasonable doubt, given the sheer quantity of the character evidence presented to the jury. Although the trial court granted the State's motion in limine, the fact remains that the substance of the character evidence was presented the jury.

VI.

THE TRIAL COURT ERRED IN REFUSING TO PERMIT THE DEFENDANT TO SHOW THAT SHE HAD COOPERATED WITH LAW ENFORCEMENT DURING THE INVESTIGATION.
¶ 46. During cross-examination of Sheriff Joe Bryant, defense counsel elicited the following:
Q. Sheriff, you weren't out there when this happened, were you?
A. No, sir.
Q. So really everything you know is by hearsay.
A. Hearsay and what the autopsy and my impression of where the body was laying and other incidents, yes, sir.
Q. Hearsay and your observation.
A. Observation.
Q. Okay, there are five surviving eye witnesses, right? There's Shane, Barbara, Sherry, Freddie, and Eric.
A. Yes, sir.
Q. You took statements from all five.
A. We took, yes, sir, we took statements from all five. I did not get a statement from Sherry Swindle.
Q. Well, I mean she told y'all a lot of stuff that y'all wrote down. She may not have given you a formal statement.
A. No, sir, she didn't give me a formal statement.
Q. One of your officers talked to her at pretty good length and got basically her side of the story, didn't he?
A. She was talked to, yes, sir; and she did some talking on her own without being questioned.
Q. I'm not suggesting y'all interrogated her improperly. I'm just saying in the ride back in she said a lot about what had happened.
A. I didn't ride back with her.
Q. Four of those witnesses are all pretty consistent, aren't they?

*1175 A. I have the statements. I wouldn't say they were consistent, no, sir.
Q. There's one of them that is markedly different from the other four.
A. Markedly different.
Q. Right.
A. I have the statements.
Q. Eric tells it considerably different from the other four, right?
A. I made the statement the night when I got through talking to them that Eric's made more sense than any of them did.
Q. But you have
A. Consistent with the body.
Q. You have disregarded the four and gone with the one.
A. No, sir, they were all considered. I did not make charges until I did more investigation and heard from the post mortem from Jackson about the path of the bullets 
Q. All right.
A. and entry places of the bullets.
Q. There are
A. There's
BY MR. HOOD: Your Honor, I object. He's not letting the witness finish his answer.
BY MR. MCDONOUGH: I didn't ask him anything. He was volunteering that.
BY THE COURT: The objection is overruled.
A. I wanted to explain why what I said about being consistent. The statement I took from Eric Allen 
BY MR. MCDONOUGH: I would like to be able 
BY THE COURT: Just a moment.
BY MR. MCDONOUGH: I'm not asking the witness any question.
BY THE COURT: Let's move on. Ask a question.
BY MR. HOOD: I think he
BY THE COURT: You'll have him on redirect.
A. I was wanting to explain the question you asked me about the statements.
¶ 47. Following cross-examination, the prosecution elicited the following from Sheriff Bryant on redirect:
Q. You were asked on cross examination whether you took statements from the parties there.
A. Yes, sir.
Q. And you were asked were three or four of them consistent and one of them wasn't consistent. Were the statements consistent to each other?
A. No, sir.
Q. Did they all give varying views?
A. Yes, sir.
Q. After considering those varying views and getting your autopsy results, what action did you take?
A. After I got from the interviews that I did get and from viewing the scene, I didn't make charges until the 5th when I got the results of the post mortem examination giving the path of the bullets and the entry wounds of the bullets. At that point I charged Sherry Swindle with manslaughter, and this is what I was trying to explain a while ago.
BY MR. MCDONOUGH: Your Honor, we're getting into speculation as to whywe know she was charged, or we wouldn't be here. He can testify as to what he saw, what he observed, what he smelled.
BY THE COURT: Just a moment. Your objection is well taken. Sustained.
Q. Were any of the statements you took consistent in any manner?
A. Eric Allen's was consistent with the post mortem results.
Q. Did Eric Allen's statement say anything about a knife?
A. No, sir.

*1176 Q. Did Freddie Wilde's statement say anything about a knife?
A. No, sir.
Q. Did Shane Thomas' statement say anything about a knife?
A. No, sir.
Q. Did Barbara Thomas' statement say anything about a knife?
A. No, sir.
Q. So they're all consistent in that manner.
A. Yes, sir.
Q. You were asked and the statement was made, "Sherry didn't tell you this or did tell you that or anything." Did you attempt to take a statement from the defendant, Sherry Swindle?
A. Yes, sir.
Q. What actions did she take when you attempted to take a statement from her?
A. I advised her of her Miranda Rights, that she was entitled to an attorney before giving a statement. She chose that she wanted an attorney before she gave a statement.
Q. Has she ever given you a statement?
A. No, sir.
Q. Any comments that Mr. McDonough made about her giving you a statement or what she said in her statement or anything, you haven't taken a statement, have you?
A. No, sir.
Q. Are you familiar with anybody at the sheriffs department sitting down and asking her what happened?
A. Sitting down and questioning, asking her what happened?
Q. Yes.
A. Not to my knowledge, other than what someone would have asked at the scene, "Who shot?"
Q. Did you attempt to do that?
A. I attempted to, I asked her about a statement, yes, sir.
Q. And she wouldn't give you one.
A. She told me she wanted a lawyer before she gave me a statement.
¶ 48. Following re-direct, defense counsel wanted to question Sheriff Bryant about any statements given by Swindle. Defense counsel argued that the State had given the impression that Swindle was not cooperative with the police when she in fact had talked and her statements were taken by an officer. Therefore, the defense argued it had a right to question Sheriff Bryant about Swindle's cooperation with the police. The trial court denied the defense's request to question Sheriff Bryant again.
¶ 49. Later in the trial testimony was taken outside the presence of the jury from Officer Danny Stout. Stout testified that he was ordered to watch Swindle while she sat in the kitchen. Stout stated that she was "kind of hysterical" and just "rambling." Stout stated he took down all that Swindle was saying. The defense wanted to introduce Swindle's statement or in the alternation offer it not for its content but for the fact that she made a statement. The trial court again denied the defense's request.
¶ 50. On appeal, Swindle argues that it was reversible error to not have allowed this evidence as it left the jury with the false impression that Swindle had not cooperated with police. Swindle also makes an argument that the prosecution impermissibly commented on her post-Miranda right to remain silent. As far as any comments on Swindle's right to remain silent, the defense failed to make any contemporaneous objection at trial; therefore, Swindle is barred from raising this alleged error on appeal. Wells v. State, 698 So.2d 497, 514 (Miss.1997).
¶ 51. The trial court properly denied the defense's request to introduce Swindle's statement. The statement she gave was nothing more than hearsay. Furthermore, the trial court properly disallowed the defense to further question Sheriff Bryant as *1177 everything the defense wanted to ask had already been covered during cross-examination. The fact that Swindle gave some type of statement and the fact that Swindle did talk and cooperate somewhat with police was all brought out on cross-examination. This assignment of error is without merit.

VII.

THE COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION FOR DISMISSAL AT THE CLOSE OF THE STATE'S CASE AND/OR THE VERDICT OF THE JURY WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 52. Swindle's motions for a directed verdict and JNOV challenge the sufficiency of the evidence supporting a guilty verdict. Butler v. State, 544 So.2d 816, 819 (Miss.1989). Swindle argues that the evidence presented at trial was insufficient to support a guilty verdict and as such should be reversed. When the legal sufficiency of the evidence is challenged, we will not retry the facts but must take the view of the evidence most favorable to the State and must assume that the factfinder believed the State's witnesses and disbelieved any contradictory evidence. McClain v. State, 625 So.2d 774, 778 (Miss. 1993); Griffin v. State, 607 So.2d 1197, 1201 (Miss.1992). On review, we accept as true all evidence favorable to the State, and the State is given "the benefit of all favorable inferences that may reasonably be drawn from the evidence." Griffin, 607 So.2d at 1201 (citations omitted). We will reverse such a ruling only where "reasonable and fairminded jurors could only find the accused not guilty." McClain, 625 So.2d at 778 (citing Wetz, 503 So.2d 803, 808 (Miss.1987); Harveston v. State, 493 So.2d 365, 370 (Miss.1986); Fisher v. State, 481 So.2d 203, 212 (Miss.1985)).
¶ 53. Swindle bases her insufficiency of the evidence argument on the fact that the State's entire case rested on the testimony of Allen, whose testimony Swindle alleges was not credible. Swindle maintains that Allen testified that Little was shot in the back when the pathologist testified that Little was shot only in the front; that Allen testified that Little was not drunk when his blood alcohol level showed a .23; and that Allen said he and Little were watching New Year Day parades the morning of the shooting when the shooting took place on January 3. A careful examination of Allen's testimony shows that he never denied that Little was drinking, only that in Allen's opinion Little was not drunk. Furthermore, Allen testified that he had given the gun back to Thomas, and he and Little were about to leave when Swindle burst forth from the trailer with the gun. Allen testified that Little was facing him with his back to the trailer when Swindle came out onto the porch and yelled "you son of a bitch." At hearing the yell, Allen testified that Little began to turn around when he was struck by the bullets. Allen did testify that he thought Little was shot in the back of the head since a pool of blood was forming there. This testimony was supported by the pathologist who testified that Little was shot on the top of the head and a bone fragment exited through the back of his head. However, Allen also testified that Little was not shot in the front as he was facing Allen. This testimony was refuted by the pathologist who testified that Little was shot in the shoulder, chest, and top of the head. However, the crux of Allen's testimony was that he and Little were about to leave when Swindle came out onto the porch and started shooting. Allen unequivocally stated that Little was not moving toward Swindle when the shooting started. There was sufficient evidence supporting the verdict.
¶ 54. The trial court also denied Swindle's motion for a new trial. A motion for a new trial tests the weight of the evidence rather than its sufficiency. Butler v. State, 544 So.2d 816, 819 (Miss. 1989). The Mississippi Supreme Court has stated:

*1178 As to a motion for a new trial, the trial judge should set aside the jury's verdict only when, in the exercise of his sound discretion, he is convinced that the verdict is contrary to the substantial weight of the evidence; this Court will not reverse unless convinced the verdict is against the substantial weight of the evidence.
Id. (quoting Russell v. State, 506 So.2d 974, 977 (Miss.1987)).
¶ 55. The lower court has the discretionary authority to set aside the jury's verdict and order a new trial only where the court is "convinced that the verdict is so contrary to the weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice." Roberts v. State, 582 So.2d 423, 424 (Miss.1991) (citations omitted). Based on the record before us, suffice it to say that the evidence was sufficient to allow the case to go to the jury, and the jury's verdict was not against the overwhelming weight of the evidence. These assignments of error are without merit.

VIII.

THE COURT ERRED IN REFUSING JURY INSTRUCTION D-16 AND D-17 THEREBY PREVENTING THE DEFENDANT FROM PRESENTING THOSE THEORIES OF DEFENSE.
¶ 56. Swindle argues that even assuming that the State's case was correct, and that Little had decided to leave, there was absolutely no evidence that this decision was communicated or demonstrated to Swindle. Therefore, Swindle claims that she may very well have not known that Little had broken off his attack, and the shooting would be a matter of misfortune or accident. Swindle argues that her two instructions on accident or misfortune were refused by the trial court and denied her the opportunity to present her defenses and was reversible error.
¶ 57. The two instructions that were refused were as follows:
D-16
The Court Instructs the jury that if you find from the evidence, or have a reasonable doubt therefrom, that Sherry Swindle, without any design or deliberation to cause the death of Chris Little, had possession of a pistol, and in the heat of passion the fatal shot was fired through misfortune, upon any sudden and sufficient provocation, then it is your sworn duty to find Sherry Swindle not guilty.
D-17
The Court instructs the jury that you are not to judge the actions of Sherry Swindle in the cool, calm light of after-developed facts, but instead you are to judge [] her actions in the light of the circumstances confronting her at the time, as you believe from the evidence that those circumstances reasonably appeared to her on that occasion; and if you believe [that] under those circumstances it reasonably appeared to Sherry Swindle at the instant she took up a weapon, that she then and there had reasonable ground to apprehend a design on the part of Chris Little to kill her or another, or to do her or another some great personal injury, and that there reasonably appeared to her to be imminent danger of such designs being accomplished, then the Defendant, Sherry Swindle, was justified in anticipating an attack by Chris Little, and further if you believe from the evidence that Chris Little died as a result of the discharge of a pistol which was, at the time of the fatal shot, in the possession of Sherry Swindle, but that the fatal shot was fired through accident and misfortune, at a time when Sherry Swindle was lawfully acting in the [sic] her own defense, or in the defense of Freddie Wilde, or Barbara Thomas or Shane Thomas, then you must find Sherry Swindle not guilty.
*1179 ¶ 58. In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. Turner v. State, 721 So.2d 642, 648 (Miss. 1998). When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. Coleman v. State, 697 So.2d 777, 782 (Miss.1997).
¶ 59. The simple fact of the matter is Swindle was not entitled to an "accident and misfortune" instruction. Only two eye witnesses to the shooting testified, namely Allen and Thomas. Both testified that Swindle deliberately shot Little. The question was not whether it was an accident but whether the shooting was justified by self-defense. Swindle received several self-defense instructions. Whether or not Swindle knew Little and Allen were about to leave went to the reasonableness of Swindle's actions, and thus covered by the self-defense instructions. This assignment of error is without merit.

IX.

THE DEFENDANT WAS PREJUDICED BY THE FAILURE OF THE STATE TO PRODUCE PHYSICAL EVIDENCE.
¶ 60. Swindle argues that it was reversible error for the State not to produce until a week before trial a half-opened knife found at the feet of Little. Swindle maintains that she was prejudiced as she had insufficient opportunity to have the knife properly examined, tested, and analyzed. Swindle further argues that the passage of time since recovery of the knife from the crime scene had rendered any subsequent analysis useless as fingerprint evidence was most likely erased every time someone handled the envelope containing the knife.
¶ 61. URCCC 9.04 provides in pertinent part:
A. Subject to the exceptions of subsection "B", below, the prosecution must disclose to each defendant or to defendant's attorney, and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request and without the necessity of court order the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution:
1. Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved of each such witness and the substance of any oral statement made by any such witness;
2. Copy of any written or recorded statement of the defendant and the substance of any oral statement made by the defendant;
3. Copy of the criminal record of the defendant, if proposed to be used to impeach;
4. Any reports, statements, or opinions of experts, written, recorded or otherwise preserved, made in connection with the particular case and the substance of any oral statement made by any such expert;
5. Any physical evidence and photographs relevant to the case or which may be offered in evidence; and
6. Any exculpatory material concerning the defendant.
Upon a showing of materiality to the preparation of the defense, the court may require such other discovery to the defense attorney as justice may require.
(emphasis added).
¶ 62. URCCC 9.04 requires the prosecution to disclose any "exculpatory material." We hold that the knife would fall under this section and should have been disclosed provided the prosecution knew of it. The record shows that the prosecution did not know of the knife and there was no deliberate design on the part of the State to *1180 deliberately conceal the knife from the defense. In fact, the record shows the defense found out about the presence of the knife before the district attorney's office.
¶ 63. Even if we were to consider this a discovery violation, we hold as harmless error this failure as no prejudice resulted from it. Sheriff Bryant testified that none of the witnesses mentioned anything about a knife so he did not think the knife was significant. Therefore, the knife was not sent off to be tested and nothing was done with the knife for almost two years until it was discovered by the defense twelve days before trial. The knife was then sent to the crime lab and no blood or fingerprint evidence was found. Sheriff Bryant testified the knife was bagged and sealed the day of the incident or the next day and placed in the evidence room where no one had any reason to handle it. Allen testified that he did not see a knife the night of the incident. Thomas testified that after Little was killed the police brought a knife to her, and she identified it as belonging to Little, but she specifically testified that she did not see Little with a knife the night of the incident.
¶ 64. The presence of the knife was made abundantly clear to the jury. We hold that Swindle was not prejudiced in any way by not knowing of the knife until twelve days before trial. This assignment of error is without merit.
¶ 65. THE JUDGMENT OF THE CIRCUIT COURT OF UNION COUNTY OF CONVICTION OF MANSLAUGHTER, AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TEN YEARS SUSPENDED PENDING GOOD BEHAVIOR AND TEN YEARS TO SERVE, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO UNION COUNTY.
KING, P.J., BRIDGES, DIAZ, IRVING, LEE, AND PAYNE, JJ., CONCUR.
McMILLIN, C.J., JOINS AS TO ISSUES IIIV.
SOUTHWICK, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY IRVING, J.
McMILLIN, C.J., JOINS ON ISSUE I.
COLEMAN, J., NOT PARTICIPATING.
SOUTHWICK, P.J., CONCURRING.
¶ 66. It is with sincere respect for the views of the majority that I nonetheless reveal one point of minor disagreement. The issue does not change the result, but only the means of reaching it.
¶ 67. The first issue raised on appeal is that the prior written statement of witness Eric Allen was improperly introduced into evidence. That statement was given to police soon after the shooting. In it Allen described the events that led to Chris Little's death. In the view of defense counsel at trial, the statement was in conflict with the trial testimony. The contested details include which way Little was facing when shot, whether Allen had heard what the defendant had said when shooting, and whether another person had possessed the gun prior to the defendant. Defense counsel merely read from the statement during cross-examination and asked about inconsistencies.
¶ 68. On redirect the State moved to admit Allen's statement into evidence since the witness "was cross-examined on it and impeached" as well. The defense counsel objected on the basis of "hearsay and an improper attempt to bolster him. What they're doing, they're trying to introduce improper prior consistent statements." The court stated that the witness had been "questioned about it over and over, so I think the jury is entitled to see it."
¶ 69. On appeal the parties argue over whether this was a prior consistent or a prior inconsistent statement. It would appear that the trial judge relied upon neither *1181 theory and just determined that since the defense had already discussed the statement at considerable length, it should be admitted into evidence. The majority here allows the admission on the basis of a prior consistent statement. Cited in support of the result is case law that predates the Mississippi Rules of Evidence, which were adopted in 1986. I acknowledge that the precise case used, White v. State, 616 So.2d 304, 308 (Miss.1993), is well after the effective date of the Rules. However the case law it quotes are not Rules of Evidence cases. The rule that those cases created and which is quoted in the majority's opinion is that if a witness's veracity has been attacked, the prosecution can introduce that witness's prior statement in order to demonstrate his veracity.
¶ 70. The Rules of Evidence might be seen as more restrictive, but regardless they control. The rule for admission requires that the prior statement be "consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication...." M.R.E. 801(d)(1)(B). The question thus becomes whether the defense made at least an implicit charge of recent fabrication. The defense examined the witness with the very statement that the State argues rebuts the implied charge of recent fabrication. In my view it is not possible to make that argument unless the defense was selectively reading the prior statement, or even falsely reading passages, or otherwise allowing a misimpression of the prior statement to be left. Generally the impeachment is from some other source, which then allows the prior consistent statement to be introduced.
¶ 71. To be clear on my point, if the prior statement is factually inconsistent as argued by the defense, it can be admitted only if it was given "under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition," and this statement was none of those things. M.R.E. 801(d)(1)(A). Else the statement is consistent, which means when the defense used it the statement did not impeach the witness so long as it was a fair description of what was in the document.
¶ 72. However, even a prior consistent statement can be so selectively used as to appear inconsistent. That concept seems to merge with another admission of evidence rule:
Rule 106. Remainder of or Related Writings or Recorded Statements
When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.
M.R.E. 106. The comment to the Rule calls this "a codification of the common law doctrine of completeness.... The rule only applies the doctrine of completeness to written or recorded statements of a specific document." M.R.E. 106 cmt. The supreme court has held that Rule 106 does not permit the introduction of an entire document when a witness was, as here, only cross-examined by reading from a writing and no part of the document was offered. Lester v. State, 692 So.2d 755 (Miss.1997).
¶ 73. A corollary to that limitation was recently adopted by this Court:
Michael Washington questioned Luke extensively about portions of each report favorable to his case, and his co-defendant, Timothy Washington, introduced one of the NCIB inspection reports into evidence. Only then did the State move to admit the remaining reports into evidence in order to give the jury a complete picture. See the comment to Rule 106 which states: "Such a rule attempts to prevent misleading the jury by taking evidence out of context."
Washington v. State, 726 So.2d 209, 216 (Miss.App.1998). Even if "Rule 106 does not necessarily require that all the remainder of a document" be admitted, it does not bar admission of "that part which *1182 `ought in fairness to be considered.'" Id. That is the purpose of Rule 106, that in order to "minimize the inaccuracy of an incomplete presentation of a record, ... trial courts have the power to determine whether `fairness' requires the proponent to introduce the whole writing" as relevant to the issues of the case. WEINSTEIN'S FEDERAL EVIDENCE § 106.02[1] (1998) at 106-5.
¶ 74. Moreover even if evidence is otherwise inadmissible, one party can open the door to its admission. Washington, 726 So.2d at 216 (citing Crenshaw v. State, 520 So.2d 131, 133 (Miss.1988)).
¶ 75. Therefore, I agree that this was a prior consistent statement. It "need not be `identical in every detail' to the trial testimony to be considered `consistent.' The test of admissibility is whether a reasonable mind would accept the central thrust of the prior statement as being consistent with the witness's in-court testimony." WEINSTEIN'S FEDERAL EVIDENCE § 801.12[2][e] at 801-34. I also find that even by using the actual statement that is considered consistent, the defense implicitly charged that what Allen was saying on the stand was different than what he had said soon after the shooting. That implies recent fabrication. So long as the central thrust of the prior statement is consistent with the trial testimony, it is a prior consistent statement even if the cross-examining attorney was attempting to show that it was not.
¶ 76. I agree the statement was admissible.
McMILLIN, C.J., JOINS ISSUE I.
IRVING, J., JOINS THIS SEPARATE OPINION.