629 So.2d 611 (1993)
Henry NEWSOM, Jr. a/k/a Henry Newsome, Jr.
v.
STATE of Mississippi.
No. 91-KA-1000.
Supreme Court of Mississippi.
December 23, 1993.
*612 J.W. Miller, Biloxi, for appellant.
Michael C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, C.J., and SULLIVAN and SMITH, JJ.
SULLIVAN, Justice, for the Court:
Several months of bad blood between Henry "Doodad" Newsom, Jr., and Eddie "The Saint" Ternoir reached its climax on the night of October 11, 1990, when Newsom shot Ternoir twice with a .357 Magnum revolver killing him. At trial Newsom claimed self-defense and the jury was instructed on murder, manslaughter and self-defense. The jury found Newsom guilty of manslaughter in the Circuit Court of the Second Judicial District of Harrison County, Mississippi, and sentenced Newsom to a term of twenty (20) years in the custody of the Mississippi Department of Corrections.
On appeal Newsom urges this Court to reverse his conviction on the grounds that he was prevented by the judge from presenting evidence in his favor and that the jury verdict against him was against the overwhelming weight of the evidence.
Newsom's version of the shooting was that he and Ternoir had had a number of confrontations before the night of the killing. On at least one occasion Ternoir had pulled a knife out and approached Newsom. On another occasion Newsom and Ternoir got in a fight and Ternoir cut Newsom beneath the eye. On still another occasion, Ternoir attempted to cut Newsom with a knife but Newsom was able to talk him out of it. At least one other witness testified that he had seen Ternoir pull a knife on Newsom in the past.
Newsom testified that on the night he shot Ternoir, Ternoir had pulled his knife and was approaching Newsom; Newsom pulled his pistol and pointed it at Ternoir and Ternoir stopped. Newsom then tried to frighten Ternoir away by walking toward him with the pistol so that Newsom could get back in his car and leave. However, this tactic failed and turned into a chasing event in which Newsom and Ternoir proceeded around two vehicles two or three times until Ternoir stopped, then Newsom fired two shots in quick succession at Ternoir, the first striking him in the chest and the second striking him in the back as he stumbled. Newsom testified that he fired the first shot because he was mad and he fired the second shot because he was afraid of Ternoir. Newsom then got in his automobile and drove away from the scene, throwing his pistol off the bridge as he left.
The testimony of other witnesses contradicts the testimony of Newsom in a few crucial respects. The jury heard from other witnesses that Newsom fired the first shot while a truck separated him from Ternoir and Ternoir fell to the ground. Newsom then walked around the truck to Ternoir and standing over him, fired the second shot into his back. This evidence was corroborated by the pathologist's testimony that one shot entered the front chest and another shot entered the back at a sharper angle. The angle was consistent with the shots being fired by a standing man while the victim lay on the ground on his back. Newsom attempted to explain the second shot by saying Ternoir turned and stumbled after the first shot, but Newsom could not explain why the *613 second shot entered the body at such a sharp angle.
The jury was also told by witnesses that Ternoir had already closed his knife and put it back in his pocket before Newsom fired the first shot. Newsom denied this. A police officer testified that when he went to the hospital he found Ternoir's knife closed and in his back pocket.
One of Newsom's witnesses, Christopher Holliman, testified that he had seen Ternoir in fights before; this testimony was excluded by the trial judge. Holliman witnessed the altercation that resulted in Ternoir's death from across the street. It took place after 10:00 p.m. in the dark. Holliman testified that he noticed that Ternoir was chasing Newsom around the truck and that Ternoir was stumbling and yelling. Holliman believed Ternoir was drunk. The prosecution objected to Holliman's statement as to Ternoir's sobriety and a proffer was made outside the jury's presence. The trial judge ruled that Holliman could testify as to only what he saw and heard, and he could not state an opinion on Ternoir's sobriety. When the jury came back in, Holliman began to give his opinion on Ternoir's sobriety. The judge sent the jury out again, and threatened to hold Holliman and the attorney in contempt. Another proffer was made, at which time the judge told Holliman that he did not know for a fact that Ternoir was drunk, and Holliman said, "That's what I'm saying." Holliman then said that he had told the court all he knew. Holliman then stated that he was not even sure who he saw chasing the other person, contrary to his previous testimony.
Newsom appeals the manslaughter verdict, citing two errors:
I. THE TRIAL COURT ERRED IN EXCLUDING CERTAIN EVIDENCE IN NEWSOM'S FAVOR, NAMELY:
A. HOLLIMAN'S TESTIMONY THAT TERNOIR HAD BEEN IN FIGHTS BEFORE;
B. HOLLIMAN'S OPINION AS TO WHETHER TERNOIR WAS INTOXICATED;
C. TESTIMONY THAT WOULD HAVE BENEFITED NEWSOM'S DEFENSE WHICH HOLLIMAN WAS TOO AFRAID TO GIVE BECAUSE OF THE TRIAL JUDGE'S THREAT TO HOLD HIM IN CONTEMPT; and,
II. THE VERDICT WAS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE.

I.

WAS NEWSOM PREVENTED FROM INTRODUCING RELEVANT EVIDENCE BY WAY OF WITNESS HOLLIMAN?

A. HOLLIMAN'S TESTIMONY THAT TERNOIR HAD BEEN IN FIGHTS BEFORE.
When Holliman testified that he had seen Ternoir in fights before, the judge sustained the objection of the prosecution and instructed the jury to disregard the statement. Rules 404 and 405, M.R.E. apply. This testimony concerns Ternoir's character for violence, and was given in the form of specific past acts, because Holliman stated that Ternoir was involved in fights. Holliman offered no opinion or reputation evidence concerning Ternoir's propensity for violence. Therefore, the question before us is whether proof in the form of specific instances of violence on the part of the victim may be introduced at trial by a criminal defendant who alleges self-defense.
The general rule is that character evidence may not be admitted to prove action in conformity therewith. Rule 404, M.R.E. However, Rule 404(a)(2) specifically authorizes inquiry by a criminal defendant into a victim's character. This exception enables defendants to prove that the victim was the initial aggressor and that the defendant acted in self-defense. Comment, Rule 404, M.R.E. Once Rule 404 has been satisfied, character evidence in the form of opinion or reputation evidence is admissible without further restriction. Rule 405(a), M.R.E. However, when character evidence passes through Rule 404(a)(2), and is offered in the form of specific instances of conduct, it is admissible only on cross-examination. Rule *614 405(a). In the instant case, Holliman's testimony was offered on direct examination during Newsom's case in chief. Therefore, it cannot be admitted through Rule 404(a)(2) and 405(a).
However, specific instances of conduct in cases where character or the trait of character is "an essential element of a charge, claim, or defense ..." are admissible whether on cross or direct examination. Rule 405(b). According to Heidel v. State, 587 So.2d 835 (Miss. 1991), past acts are admissible in cases where a defendant alleges self-defense, concluding that the character trait of violence was an "essential element" of the defense under 405(b). Heidel, 587 So.2d at 843-47. Holliman said that he had seen the victim, Ternoir, in fights before. Since this testimony on direct examination was character evidence in the form of specific past acts, it was admissible under Rule 405(b).
Rule 405(b) allows specific instances of conduct to be admitted if its restriction is satisfied, without regard to whether it was first admissible under Rule 404. Rule 405(a) begins, "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation... ." Hence, 405(a) is connected to 404; but, since 405(b) has no such qualifying clause, it admits evidence independently of Rule 404, even though the overlap may yield mirrored results.
The trial court erred in excluding Holliman's testimony that he had seen Ternoir in fights before. However, we are not required to reverse a case based solely upon the showing of an error in evidentiary ruling. A denial of a substantial right of the defendant must have been affected by the evidentiary ruling; in this case, that right is the accused's right to a fair trial. Ponthieux v. State, 532 So.2d 1239, 1248 (Miss. 1988), Rule 103(a), M.R.E.
Since the right to a fair trial, a constitutional right, is involved, reversal is required unless "on the whole record, the error was harmless beyond a reasonable doubt." Hoover v. State, 552 So.2d 834, 840 (Miss. 1989).
On the whole record this error by the trial judge was harmless. Ternoir's violent character was already admitted. Alex Smith, who testified before Holliman did, had already told the jury he knew Ternoir's reputation for cutting people with a knife. Smith testified that on one occasion Ternoir had attempted to cut Newsom.
Furthermore, Newsom testified that Ternoir had, on another occasion, cut him beneath the eye, and on yet another occasion, Ternoir attempted to cut him with a knife. With this evidence presented to the jury, the lack of Holliman's testimony that Ternoir had been in fights before would not have added so much to Newsom's case that to exclude Holliman's testimony was reversible error.

B. HOLLIMAN'S OPINION AS TO WHETHER TERNOIR WAS INTOXICATED.
Mississippi law allows a lay witness to give an opinion. Rule 701, M.R.E. But such an opinion is admissible only if it is rationally based on the witness' perception and is helpful to a clear understanding of his testimony or of a fact in issue. Rule 701, M.R.E. When it was adopted, Rule 701 was a departure from prior practice, when lay opinions were generally excluded. See Comment, Rule 701, M.R.E. The question before us is whether Holliman had first-hand knowledge or observation of Ternoir's state of sobriety on the night in question, and whether or not Holliman's opinion, if true, would have supported a rational inference that the intoxication had any bearing whatsoever on the claim of self-defense. Secondarily, the court must determine whether the refusal of the trial judge to allow Holliman's opinion testimony on the intoxication of the victim deprived the defendant of any substantial right to a fair trial. Turner v. State, 573 So.2d 1335, 1340 (Miss. 1990).
It is apparent from the record that the trial judge excluded references by Holliman concerning Ternoir's state of sobriety, because he concluded that no showing had been made that Holliman was able to give such an opinion. Holliman's opinion would have had to have been based only upon the motions he saw and the voices he heard from across the street. Also, Holliman apparently admitted that he was unable to determine whether Ternoir was intoxicated or not. In fact, at one point, Holliman stated that he did not *615 know whether he saw Ternoir chasing Newsom or Newsom chasing Ternoir.
The exclusion of this inconsequential evidence does not affect Newsom's substantial right to a fair trial and does not require reversal of his conviction. The admissibility of evidence rests within the trial court's sound discretion and here there was no abuse. Hall v. State, 611 So.2d 915, 918 (Miss. 1992).

C. WAS THERE TESTIMONY THAT WOULD HAVE BENEFITED NEWSOM'S DEFENSE WHICH HOLLIMAN WAS TOO AFRAID TO GIVE BECAUSE OF THE TRIAL JUDGE'S THREAT TO HOLD HIM IN CONTEMPT?
We might infer that Holliman was intimidated by the judge's threats of holding him in contempt, because his statements subsequent to the judge's threat were less assertive and even inconsistent with some of his previous testimony. However, we might also infer that Holliman was stretching the truth beforehand and then retracted his previous testimony in order to cure a misunderstanding. Furthermore, after being told a second time that he could not testify about Ternoir's sobriety, Holliman told the judge that he had already testified as to what he saw and heard. When the trial judge gave the defense attorney another chance to proffer Holliman's testimony, Holliman said that he had already told the court what he witnessed.
Furthermore, this assignment is without merit, because what Holliman would have said is nowhere in the record. In fact, the alleged intimidation is not clearly reflected in the record either. Even if we assume that Holliman was, in fact, intimidated, we do not know what testimony, if any, he would have given. We do know that Holliman indicated that he had already told all that he knew. Newsom's appellate brief cites no authority concerning this issue and it is without merit.

II.

WAS THE VERDICT CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE?
A verdict shall stand unless it is so contrary to the overwhelming weight of the evidence that it works an unconscionable injustice. Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983).
One need only read Newsom's testimony to see that it was reasonable for a juror to conclude that Newsom was guilty of manslaughter. The testimony of several of the other eyewitnesses at the event would also allow a reasonable juror to conclude that Newsom was guilty of murder. Therefore, the manslaughter verdict was not contrary to the overwhelming weight of the evidence, and this assignment of error is without merit.
CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.