COLEMAN, J., for the Court:
¶ 1. The State prosecuted the appellant, Willie Hamilton, on an indictment for the crime of “deliberate design” murder in the Circuit Court of Grenada County. Pursuant to the jury’s verdict that Hamilton was guilty of murder, the trial court entered its judgment of Hamilton’s conviction, in which it sentenced Hamilton to serve the remainder of his natural life in the custody of the Mississippi Department of Corrections. In his appeal from the trial court’s judgment of conviction and sentencing, Hamilton presents for this Court’s analysis and resolution the following two issues, which we quote verbatim from the statement of issues required by Mississippi Rule of Appellate Procedure 28(a)(3) contained in his brief:
1. THE TRIAL COURT ERRED WHEN IT REFUSED TO ALLOW APPELLANT TO PUT [ON] PROOF REGARDING THE VIOLENT PROPENSITIES OF THE VICTIM SINCE EVIDENCE OF THOSE PROPENSITIES WAS RELEVANT TO THE ISSUES OF THE APPELLANT’S STATE OF MIND, HIS CLAIM OF SELF-DEFENSE, AND ALSO WHETHER THE VICTIM WAS THE FIRST AGGRESSOR.
2. THE TRIAL COURT ERRED WHEN IT ALLOWED INTO EVIDENCE PHOTOGRAPHS TAKEN AT THE AUTOPSY SHOWING INSTRUMENTS OF THE EXAMINING PHYSICIAN STUCK INTO AND PROTRUDING OUT OF THE BODY OF THE VICTIM.
Our review and analysis of these two issues result in our affirming the trial court’s judgment of conviction and its sentence of life imprisonment imposed on the appellant, Willie Hamilton.
I. FACTS
¶ 2. On the morning of December 27, 1996, Willie Hamilton drove his two young sons, Marcus, eleven years old, and Wesley, nine years old, from his home in Pope to visit their mother, Vickie Lynn Hamilton, who lived in Apartment No. D-l in the Pine Hill Apartments located at 700 Washington Street in the City of Grenada. Willie Hamilton and Mrs. Hamilton had married in 1984, but they had been separated for quite some time. When Hamilton knocked on the front door of his estranged wife’s apartment, Dewanda Tellis, who was Vicky Lynn Hamilton’s seventeen-year-old daughter, awoke in her bed *1175 room, got out of bed, and walked to the front door. When she opened the front door, Hamilton asked Ms. Tellis to ask her mother, “[C]an the boys come in?” Ms. Tellis closed the front door, went to her mother’s bedroom, and asked her mother, Vickie Lynn Hamilton, if her two sons might come inside. Mrs. Hamilton replied that Wesley and Marcus might come inside, but she instructed her daughter, “[D]on’t let [Mr. Hamilton] in [her] house.” When Ms. Tellis returned to the front door and told Hamilton that his sons could enter the apartment but that he could not, Hamilton replied that he did not want to come inside. Wesley and Marcus went inside their mother’s apartment, and Hamilton returned to his vehicle, a brown El Camino, and drove away.
¶ 3. Fifteen or twenty minutes later, Hamilton returned to his wife’s apartment and began knocking on the front door. This time, Marcus Hamilton opened the front door. Willie Hamilton asked, “Can I come in?” Vickie Lynn Hamilton called out, “Well, no, Willie, you can’t come in.” Nevertheless, Hamilton entered the apartment, and an argument between Hamilton and his wife ensued. The argument culminated in Hamilton’s stabbing his wife two times by his own admission and leaving her lying across a couch in the living room with her legs hanging over its end and her upper torso lying partly on the couch and partly on the floor.
¶4. The Hamiltons’ altercation in the living room re-awakened Dewanda Tellis, who ran from her bedroom into the living room in time to see Hamilton with “his hand up in the air” standing over her mother, who was lying on the couch. Ms. Tellis saw Hamilton stab her mother “above the knee.” Ms. Tellis grabbed Hamilton around his waist and scuffled with him in an effort to protect her mother. While they scuffled, Hamilton reached over Ms. Tellis and stabbed his wife two more times. Then, Hamilton tried to exit through the front door, but he tripped over Vickie Lynn Hamilton, who had fallen entirely onto the floor after Hamilton had finished stabbing her. Another scuffle ensued between Dewanda Tellis and Hamilton for the knife which Hamilton dropped as he stumbled over his wife. Hamilton recovered the knife and ran from the apartment, gathered his two sons, who had earlier run from the apartment for help, and drove away with his sons in his El Camino toward Water Valley.
¶ 5. Natasha Tellis, who ■ was • Vickie , Lynn Hamilton’s niece, had been sleeping in Mrs. Hamilton’s bedroom when the noise of the Hamilton’s altercation awakened her. When Natasha Tellis saw Hamilton attacking her aunt on the couch, she returned to Mrs. Hamilton’s bedroom, where she selected a bottle from among her aunt’s collection of bottles to wield in her defense of Mrs. Hamilton. Natasha Tellis returned to the , living room and hurled the bottle at Hamilton. After Hamilton left his wife’s apartment, Dewan-da Tellis ran next door to the apartment occupied by Ms. Bessie Brooks and begged Ms. Brooks to call the police. However, Ms. Brooks had already called the police because she heard the disturbance next door in Mrs. Hamilton’s apartment.
¶ 6. Grenada policeman George Douglas responded to the call for help at 9:43 o’clock. When Officer Douglas entered Mrs. Hamilton’s apartment, he found Johnny Sandborn kneeling over Mrs. Hamilton, who was lying on the floor. Officer Douglas observed blood “about the chest area” of Mrs. Hamilton. Johnny Sandborn had been driving his truck toward his apartment when “one of the little boys [Marcus Hamilton] ran up and hit[] on the side of [his] truck hollering, ‘Help! Help! My daddy is stabbing my mamma.’ ” Sandborn followed Marcus to Mrs. Hamilton’s apartment.
¶ 7. James Russell Carver, a detective with the Grenada Police Department, arrived at the apartment after Officer Douglas had secured it. Mrs. Hamilton had already been taken to the hospital. Although both Officer Douglas and Detective *1176 Carver acknowledged that their search was only “visual,” neither officer found any knife or other weapon in the living room. Later, Detective Carver observed the postmortem examination of Mrs. Hamilton’s corpse which a Grenada pathologist, Dr. Tom McGee, performed in the morgue of the hospital in Grenada. Dr. McGee identified and described twelve distinct wounds on and about a finger, a wrist, and chest of her corpse. During Detective Carver’s observation of the autopsy, he took approximately fifteen pictures of the thirteen wounds which Dr. McGee identified and described in the course of his examination. Six of these photographs depicted several of the wounds with a surgical instrument inserted into them.
¶ 8. Later that day, Willie Hamilton drove to the home of his employer, Mike Darby, a resident of Pope, Mississippi, and a former Panola County supervisor. Darby and his wife saw Hamilton walking toward them as they were “coming out from [their] garage at [the Darbys’ home].” Crying, Hamilton told Darby, “Mike, I have killed Lynn.” Hamilton asked Darby to take him to the Tallahat-chie County Sheriffs Department. After Darby called to confirm that “they were looking for [Hamilton],” Darby prepared to drive Hamilton to the sheriffs department. As Darby got into the driver’s side of his pickup truck, Patrick Sheggog, who had ridden with Hamilton to Darby’s residence and whom Darby knew, approached Darby with a knife. Sheggog handed the knife to Darby and said, “This is Willie’s.” Darby gave the knife to a deputy sheriff after Hamilton and he had arrived at the sheriffs department.
II. REVIEW, ANALYSIS, AND RESOLUTION OF THE ISSUES
A. Hamilton’s first issue

1. Preliminary matters

¶9. The gist of Hamilton’s two issues allows this Court to refrain from an extensive review of all the evidence adduced by both the State and Hamilton during the trial of this case. Instead, we focus on those portions of the trial which begot Hamilton’s issues. Hamilton testified to establish that his taking his wife’s life was a matter of self-defense. However, the jury’s verdict that Hamilton was guilty of murder indicates that the jury rejected the credibility of Hamilton’s testimony and, instead, evaluated the testimony of the State’s witnesses as being more credible. Thus, our recitation of the facts was consistent with the State’s evidence where Hamilton’s testimony varied from the testimony of the State’s witnesses. Hamilton propounds his first issue from the trial court’s refusal to allow Grenada Police Officer Melanie Cannon to testify about her investigation of Vickie Lynn Hamilton’s having previously stabbed her then male friend, Wyodia Bland, with a knife.

2. Basis for the issue as contained in the record

¶ 10. Under his counsel’s direct examination, Hamilton offered the following explanation for having the knife when he entered his wife’s apartment two days after Christmas. He had carried his hunting knife with him when he went deer hunting Christmas Day. He had put the knife in the pocket of the “big feather coat” when he left home to hunt for deer. When he returned home from deer hunting, he put his coat with the knife still in the coat pocket in the closet. Two days later, he took his coat from the closet and wore it when he drove his two sons to get their Christmas presents from their mother’s apartment. Hamilton explained that he did “not know[ ] that the knife was in [his coat pocket] until I got down here [inside Vickie Lynn Hamilton’s apartment] and the fight got ... started, and I realized I had a knife in my pocket of my own.” The record contains the following direct examination which immediately followed Hamilton’s explanation of his having the knife:
*1177 Q. When this — why did you take the knife out?
A. Because I was scared. She had a knife of her own, and she had done [sic] already cut up somebody else, and I didn’t want to be the next one.
Q. Who [sic] had she only cut up?
A. I was scared. The man that [sic] was living with her.
Q. What is his name—
BY THE DISTRICT ATTORNEY: Your Honor.
BY THE WITNESS:
A. —Wyodia Bland.
¶ 11. At this point both the State and Hamilton’s counsel argued briefly the basis for the State’s objection to Hamilton’s last answer, ie., that Vickie Lynn Hamilton had “cut up” Wyodia Bland. The Court resolved the dispute as follows: “Well, I mean just move on. I think you have gotten into this issue enough.” Hamilton’s direct examination concluded with his statements that he was scared that his wife was “fixing to cut me,” that he never intended to kill his wife, and that he did not go to his wife’s apartment with the intent to kill her.
¶ 12. As his second witness, Hamilton called Grenada Police Officer Melanie Cannon. Before Hamilton’s counsel began to question Officer Cannon, the district attorney objected to her testifying at all “for the purpose of testifying that the victim in this case [Vickie Lynn Hamilton] had been accused of cutting a different individual and at a different time.” After the trial court granted what it termed “the State’s ... motion in limine,” Hamilton’s counsel proffered Officer Cannon’s testimony outside the jury’s presence, which we summarize as follows. On September 22, 1996, Officer Cannon was called to Vickie Lynn Hamilton’s apartment in response to a report of a fight in progress. When Officer Cannon arrived at Mrs. Hamilton’s apartment, she found both Mrs. Hamilton and Wyodia Bland standing in the apartment complex parking lot. Bland was bleeding from his hand. Vickie Lynn Hamilton admitted to Officer Cannon that she had wounded Bland with a knife. Officer Cannon filed an affidavit which charged Mrs. Hamilton with “domestic violence,” and Mrs. Hamilton subsequently pleaded guilty to that charge in the Municipal Court of the City of Grenada. Under the State’s cross-examination, Officer Cannon acknowledged that what she knew about the incident between Bland and Mrs. Hamilton was based on “just hearsay from what she said.”

3. Hamilton’s argument

¶ 13. Hamilton argues that his testimony “clearly raised a question for the jury to decide whether Vickie Hamilton or appellant [Willie Hamilton] was the initial aggressor and whether appellant’s attack on Vickie began in self-defense.” Hamilton asserts that “Rules 404(a)(2) and 405(b) of the Mississippi Rules of Evidence allow the introduction of specific acts of violence by a victim on previous occasions with third persons in a trial where a defendant is claiming self-defense.”[1] Hamilton cites Green v. State, 614 So.2d 926, 933 (Miss.1992) and Heidel v. State, 587 So.2d 835, 847 (Miss.1991) as precedent supporting his argument.
• A A change in the law
¶ 14. Once upon a time, “testimony of antecedent specific acts of violence between the deceased and third persons [were] not admissible to show the bad reputation of the deceased.” See Ray v. State, 381 So.2d 1032, 1036 (Miss.1980). However, as the supreme court later held in Green v. State, 614 So.2d 926, 934 (Miss.1992), Mississippi Rule of Evidence 405 *1178 “allows proof of specific instances of conduct to be admitted into evidence when character is an essential element of the accused’s defense.” In Green, the appellant had been convicted of the murder less than capital of Ralph Dean, a policeman for the Town of Mize. Id. at 927. Green contended that he slew Dean in self-defense. Id. at 934. The trial court denied Green’s proffer of evidence regarding Officer Dean’s “conduct indicating that Dean was violent.” Id. at 931. Included in Green’s proffer of evidence was Dean’s physical abuse of Dean’s wife and Dean’s conviction “in Justice Court for assault on a minor child.” Id. Relying on the change wrought by Rule 405, the Mississippi Supreme Court held that the trial court erred when it denied Green’s proffer of evidence of Dean’s violent conduct, even though the proffer did not involve Dean’s violence toward Green, and reversed and remanded Green’s conviction. Id. at 937. Earlier the supreme court had reversed a murder conviction because the trial court had excluded evidence of the victim’s prior threats she had made toward the appellant with a butcher knife in Heidel v. State, 587 So.2d 835, 847 (Miss.1991).

5. Harmless versus reversible error and the standard of review for its determination

¶ 15. Green supports Hamilton’s argument. As an abstract proposition and without further analysis of other admissibility aspects of Officer Cannon’s testimony about Vickie Lynn Hamilton’s cutting Wyodia Bland, this Court holds that the trial court erred in refusing to allow Officer Cannon to testify at all about Ms. Hamilton’s previous act of violence toward Bland. However, if this error were harmless, then reversal and remand are not warranted. In Catholic Diocese of Natchez-Jackson v. Jaquith, 224 So.2d 216, 221 (Miss.1969), the supreme court discussed the distinction between harmless and reversible error as follows:
To warrant reversal, two elements must be shown: error, and injury to the party appealing. Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case; it is prejudicial, and ground for reversal, only when it affects the final result of the case and works adversely to a substantial right of the party assigning it. Obviously, in order for the rule of harmless error to be called into play in support of a judgment, the judgment must be otherwise supportable, and will be reversed when there is nothing in the pleadings or evidence to support it....
(quoting 5 Am.Jur.2d Appeal and Error sec. 776 (1962)). Later, the supreme court related a more stringent concept of “harmless error” in Forrest v. State, 335 So.2d 900, 903 (Miss.1976), when it opined, “An error is harmless only when it is apparent on the face of the record that a fair minded jury could have arrived at no verdict other than that of guilty.” (citations omitted).
¶ 16. The Mississippi Supreme Court dealt with the more specific relationship between the trial court’s commission of error in refusing to admit evidence proffered by the criminally accused and whether that error was harmless constitutionally in Newsom v. State, 629 So.2d 611 (Miss.1993). The supreme court explained:
However, we are not required to reverse a case based solely upon the showing of an error in evidentiary ruling. A denial of a substantial right of the defendant must have been affected by the eviden-tiary ruling; in this case, that right is the accused’s right to a fair trial. Ponthieux v. State, 532 So.2d 1239, 1248 (Miss.1988), Rule 103(a), M.R.E.
Since the right to a fair trial, a constitutional right, is involved, reversal is required unless “on the whole record, the error was harmless beyond a reason *1179 able doubt.” Hoover v. State, 552 So.2d 834, 840 (Miss.1989).
Newsom, 629 So.2d at 614.

6. Resolution of the first issue

¶ 17. Newsom v. State, 629 So.2d 611, 618-14 (Miss.1993), combined -with our subsequent review of the State’s evidence in the case sub judice, persuades this Court that the trial court’s error in sustaining what was essentially the State’s motion in limine about Officer Cannon’s testimony was harmless “beyond a reason'able doubt.” In Newsom, the appellant was indicted for murder but convicted of manslaughter. Neiosom, 629 So.2d at 612. When one of Newsom’s witnesses testified that he had seen Eddie Ternoir, whom Newsom killed, in fights before, the judge sustained the State’s objection and instructed the jury to disregard the statement. Id. at 613. Opining that Rule 405(b) “admits evidence independently of Rule 404,” the supreme court held that “[t]he trial court erred in excluding [the witness’s] testimony that he had seen Ter-noir in fights before.” Id. at 614. Regardless of this error, .the supreme court affirmed Newsom’s conviction because after further analysis, which we subsequently quote, the supreme court found the error to be harmless:
On the whole record this error by the trial judge was harmless. Ternoir’s violent character was already admitted. Alex Smith, who testified before Holli-man did, had already told the jury he knew Ternoir’s reputation for cutting people with a knife. Smith testified that on one occasion Ternoir had attempted to cut Newsom.
Furthermore, Newsom testified that Ternoir had, on. another occasion, cut him beneath the eye, and on yet another occasion, Ternoir attempted to cut him with a knife. With this evidence presented to the jury, the lack of Holliman’s testimony that Ternoir had been in fights before would not have added so much to Newsom’s case that to exclude Holliman’s testimony was reversible error.
Newsom, 629 So.2d at 614.
¶ 18. We began our review of this issue with the quotation of Hamilton’s testimony, to which the State did not object, that “[Mrs. Hamilton] had ... already cut up somebody else,.... ” Hamilton identified that “somebody else” as “Wyodia Bland.” Thus, Hamilton’s testimony established his wife’s specific instance of violent conduct about which his counsel sought to have Officer Cannon testify. Vickie Lynn Hamilton’s having “already cut up somebody else,” which appellant Hamilton knew, was before the jury.[2]
¶ 19. Dr. Tom McGee, the pathologist who performed the post-mortem examination of Mrs. Hamilton’s corpse, identified no fewer than twelve distinct knife wounds inflicted upon her corpse. One was on her left forearm. Another was described as: “The dorsal left wrist had a through and through wound.... ” Dr. McGee described other wounds on the left ring finger which went to the bulb, on the mid-line of the right knee, into the right breast, over the lower sternum, through and through the left breast, a penetration of the abdominal cavity below the left diaphragm, and on and on. While none of these wounds were lethal, the fatal wound “cut through the ascending aorta.” Twelve distinct wounds connote many slashes by Hamilton with his knife.
¶ 20. Hamilton testified that he could only remember having stabbed Mrs. Ham *1180 ilton two times. Hamilton’s nine-year-old son, Wesley Hamilton, testified about the altercation between his parents. After Wesley Hamilton testified that he had seen his father stab his mother one time in her knee, the prosecutor asked, “Did your mother have any kind of a weapon or anything like that?” Wesley answered, “No.” Under cross-examination, Wesley testified that he followed his parents into the kitchen, where “[t]hey were arguing.” According to Wesley under cross-examination, his father told his mother “to come back there in the bedroom,” to which she responded by telling “him to put the knife down.” Next, Mrs. Hamilton struck her husband in his shoulder with her fist. The next event Wesley witnessed was his father’s stabbing his mother “in the leg.” According to Wesley, Mrs. Hamilton “fell back on her stereo,” and Wesley “ran out” to summon help.
¶ 21. In summary, the following three aspects of the evidence in this case combine to persuade this Court that the trial court’s refusal to allow Officer Cannon to testify about Mrs. Hamilton’s having stabbed Wyodia Bland in his hand was harmless error. First, Hamilton testified that his wife had “cut up” Wyodia Bland, with whom she was then living. Secondly, Dr. McGee’s description of twelve knife-inflicted wounds scattered about Vickie Lynn Hamilton’s corpse belies the ferocity of his assault with his knife on his wife. Such ferocity seems to exceed what would reasonably have been required to repel his wife’s attack with her knife. Of course, whether she had a knife was placed in issue by Wesley Hamilton’s testimony that she did not have a knife. Thirdly, while Hamilton’s counsel proffered Officer Cannon’s testimony, the extent to which her testimony would have been admissible in the face of the State’s other bass for objection remains unsettled in this Court’s evaluation. Therefore, while this Court finds that the trial court erred in refusing to allow Officer Cannon to testify, the error was harmless beyond a reasonable doubt. Thus, we resolve Hamilton’s first issue adversely to him.
B. Hamilton’s second issue

1. Standard of Review

¶ 22. For his second issue, Hamilton asserts error in the trial court’s granting the State’s motion to admit into evidence six of the approximately twenty photographs which James Carver, a detective with the City of Grenada Police Department, took of Dr. Tom McGee’s postmortem examination of Mrs. Hamilton’s remains. Hamilton objected only to these six photographs because they “show[ed] instruments of the examining physician stuck into and protruding out of the body of [Mrs. Hamilton].” Generally, the determination of admissibility of photographs is a matter left to the sound discretion of the trial court. Brown v. State, 690 So.2d 276, 288 (Miss.1996); Blue v. State, 674 So.2d 1184, 1210 (Miss.1996); Jackson v. State, 672 So.2d 468, 485 (Miss.1996). An appellate court will uphold the trial judge’s decision in the absence of a clear abuse of that discretion. Blue, 674 So.2d at 1210; Jackson, 672 So.2d at 485. Therefore, even if unpleasant, a photograph may still be admitted if it has probative value and serves a meaningful evidentiary purpose. Hart v. State, 637 So.2d 1329, 1335 (Miss.1994); Kniep v. State, 525 So.2d 385, 388 (Miss.1988).
¶ 23. Specifically, photographs of victims’ bodies are admissible in criminal cases “where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory.” Sudduth v. State, 562 So.2d 67, 69 (Miss.1990) (citations omitted). “[P]hotographs of a victim have evidentiary value when they aid in describing the circumstances of the killing....” Westbrook v. State, 658 So.2d 847, 849 (Miss.1995). Therefore, photographs of' homicide victims have often been ruled admissible. Gossett v. State, 660 So.2d 1285, 1293 (Miss.1995) (photographs de *1181 picted victim of multiple shooting); Alexander v. State, 610 So.2d 320, 338 (Miss.1992) (autopsy photograph which depicted open skull of victim); Hewlett v. State, 607 So.2d 1097, 1102 (Miss.1992) (photographs of charred bodies of homicide victims).
¶ 24. The restriction of Mississippi Rule of Evidence 403 still applies, however. If the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, the photograph will be excluded. Kniep v. State, 525 So.2d 385, 388 (Miss.1988). Noteworthy for this Court is the supreme court’s statement that “[a]t this point in the development of our case law, no meaningful limits exists [sic] in the so-called balance of probative/prejudicial effect of photographs test.” Robinson v. State, 662 So.2d 1100, 1105 (Miss.1995) (quoting Williams v. State, 544 So.2d 782, 785 (Miss.1987)).

2. Resolution of the issue

¶ 25. During the trial, the defense objected to the admission of the photographs admitted as S-17, S-19, S-22, S-25, S-32, and S-36, because the instruments protruding from the wounds could be compared to a knife stuck in the body. Also, the defense expressed concern about these photographs’ creating confusion about which wounds were inflicted by the knife wielded by Hamilton and which wounds were the result of the surgeon’s scalpel at the hospital during efforts to resuscitate the victim. The photographs in question were admitted as Dr. McGee referred to them in describing the autopsy results to the jury. In each instance, Dr. McGee explained the need for using the instrument to demonstrate some aspect of the wound portrayed in the photograph. For instance, one photograph depicted an instrument protruding from both sides of a wrist to demonstrate that Hamilton’s knife had passed completely through it.
¶ 26. Hamilton argues that admission of these six photographs was highly prejudicial and inflammatory because the State’s remaining evidence established that “the victim had been stabbed at least twelve times, that the wounds varied in length and depth, and that she had died as a result of one or more of those wounds.” He claims that these were not issues before the court because other photographs showed the wounds and because witnesses testified to these facts. The State contends that the photographs offered proof on issues of conflicting evidence, among which were Hamilton’s testimony that he remembered stabbing his wife only two times, and that he had stabbed her in self-defense. Thus, the State contends that these six photographs along with the remaining photographs to which Hamilton did not object depicted the depth and angle of Mrs. Hamilton’s twelve wounds and thus refuted Hamilton’s claim that he stabbed his wife in-self-defense.
¶27. Hamilton cites Sudduth v. State, 562 So.2d 67, 69 (Miss.1990) for the suggestion that photographs of the victim’s body should not be admitted if the killing is not contradicted or denied and if the victim’s identity has been established. The defendant in Woodward v. State, 726 So.2d 524, 534 (¶ 36) (Miss.1997) relied on Sudduth for the same purpose. The supreme court addressed Woodward’s argument with the following reasoning:
Woodward contends that these pictures were gruesome and prejudicial and without probative value (since corpus de-licti, cause of death, location and or identity of the victim were not at issue). In support of his argument, Woodward cites Sudduth v. State, 562 So.2d 67 (Miss.1990), in which this Court noted that “photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established.” Sudduth, 562 So.2d at 70.
However, the very next sentence in the Sudduth opinion states the general rule with regard to the admission of this type photograph: “Photographs of bodies may nevertheless be admitted into *1182 evidence in criminal cases where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory.” Sudduth, 562 So.2d at 70; See Brown v. State, 690 So.2d 276, 289 (Miss.1996); Alexander v. State, 610 So.2d 320, 338 (Miss.1992).
Woodward v. State, 726 So.2d 524, 534-35 (¶¶ 36,37) (Miss.1997).
¶ 28. The supreme court addressed similar issues in Kniep v. State, 525 So.2d 385, 388 (Miss.1988), where the court upheld the admission of photographs of the homicide victim. The supreme court explained the decision with the following reasoning:
[T]he trial court was of the opinion that photographs were probative on the issue of the manner of death. In addition, the photographs tended to corroborate the use of a firepoker as the murder weapon and established both the multiplicity of bloivs administered and the extent of force and violence used.
Kniep v. State, 525 So.2d 385, 388 (Miss.1988) (citations omitted) (emphasis added). In the case sub judice, photographs of Vickie Lynn Hamilton’s wounds from which these instruments protruded established the direction in which Hamilton’s knife traveled into his wife’s body and the power with which his knife was propelled into her body. “Photographs contain probative value when they supplement or add clarity to witness’ testimony.” Gossett v. State, 660 So.2d 1285, 1292 (Miss.1995) (citing Hughes v. State, 401 So.2d 1100, 1106 (Miss.1981); Norman v. State, 385 So.2d 1298, 1303 (Miss.1980)). Rather than being merely cumulative, the autopsy photographs of Vickie Hamilton served to clarify the pathologist’s clinical descriptions of the locations, depths, and angles of the stab wounds. See Hart v. State, 637 So.2d 1329, 1336 (Miss.1994) (affirming admission where pathologist utilized like photos during testimony). See also Turner v. State, 573 So.2d 657, 667 (Miss.1990); Lanier v. State, 533 So.2d 473, 484 (Miss.1988) (both finding no abuse of judicial discretion in admitting photographs used in conjunction with testimony by the physician who performed the autopsy).
¶ 29. In the case sub judice, the medical instruments in the body were not used “to puncture, sever, dissect and otherwise traumatize body parts” as Hamilton advances by citing Jackson v. State, 684 So.2d 1213, 1230 (Miss.1996). The punctures from the knife already existed at the time of the autopsy; the instruments were used to assess the punctures. Because these six photographs contradicted Hamilton’s testimony that he could remember stabbing his wife only two times, and because the location and nature of these wounds demonstrated the potentially brutal manner in which Hamilton slashed at Mrs. Hamilton with his knife, they appear to impeach that testimony. Moreover, the number of wounds, even if all but one were described by Dr. McGee as “not lethal,” may have indicated to the jury a degree of brutality in Hamilton’s attack on his wife which exceeded whatever force might otherwise have reasonably been required to repel her attack on him with her knife, about which Hamilton also testified. Because we find that the relevancy of these six photographs exceeded whatever prejudice to Hamilton they may have had because they also depicted various surgical instruments in or about the depicted wounds, we find no abuse of discretion in the trial court’s admission of these six photographs into evidence on the State’s motion. This Court affirms the trial court’s admission of these six photographs into evidence.
¶ 30. THE GRENADA COUNTY CIRCUIT COURT’S JUDGMENT OF THE APPELLANT’S CONVICTION OF MURDER AND ITS SENTENCE OF APPELLANT TO SERVE THE REMAINDER OF HIS LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ARE AFFIRMED. ALL COSTS OF THIS *1183 APPEAL ARE ASSESSED TO GRENADA COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.

. Rule 405(b) provides:
In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.
M.R.E. 405(b).

. The record reflects that ”[t]he Court continued with the reading of the instructions followed by final arguments from both sides, all without objection, and which were not requested to the transcribed.” Omission of Hamilton's counsel’s closing argument from the record precludes this Court’s determining whether defense counsel alluded to Mrs. Hamilton's having cut Wyodia Bland's hand in his closing argument; but it would seem that Hamilton's counsel was entitled to argue the significance of this particular act of violence to support Hamilton's defense of self-defense.