# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-00660-SCT

*EDWARD ROBERT HARVEY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/09/2022 |
| TRIAL JUDGE: | HON. M. BRADLEY MILLS |
| TRIAL COURT ATTORNEYS: | JACQUELINE LANDES PURNELL |
| | SAMUEL LEE WILKINS |
| | JOHN K. BRAMLETT, JR. |
| | LINDSEY McGEE TURK |
| | JAMES HOWARD MURPHY |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/08/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., COLEMAN AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Edward Harvey was indicted in the Rankin County Circuit Court for aggravated domestic violence and kidnapping. Following a jury trial, Harvey was convicted of aggravated domestic violence and was acquitted of kidnapping. He was sentenced to twenty years in the custody of the Mississippi Department of Corrections.

¶2.     Harvey appeals his conviction, claiming that the trial court erred by (1) prohibiting him from presenting relevant defense evidence and by (2) allowing an improper jury instruction regarding prior-bad- act evidence. We find that both issues are without merit, and we affirm Harvey's aggravated domestic violence conviction.

## FACTS AND PROCEDURAL HISTORY

¶3.     In April 2021, Harvey returned to his home in Pearl, Mississippi, from an out-of-town trip. Harvey's wife Tammy was still at work, and she had left her old cell phone on a nightstand.[1]  Harvey saw a number of romantic text messages on the phone from another man.

¶4.     According to Tammy, when she arrived home Harvey was standing next to the bed holding a handgun. Harvey told Tammy that he was going to "blow [her] f-ing brains out."

¶5.     Harvey walked over to Tammy and grabbed her by the neck. He threw her against the door and then slammed her into the wall while repeatedly putting the gun to Tammy's head. When Harvey released Tammy, she tried to run, but Harvey grabbed her by the hair and pulled her back into the bedroom, telling Tammy he would kill her.

¶6.     Harvey told Tammy to get on the bed, and Tammy complied. She thought Harvey was going to force her to have sex. But Harvey instead approached her and started choking her before pressing the gun to her head. Harvey made Tammy stand up, and he continued choking and yelling questions at her. Tammy said Harvey would "pop" her in the face with the butt of the gun when she did not answer and then place the gun back to her head.

---

[1] According to Tammy, she had gotten a new phone. Her old phone was not activated, but it still had information on it.

¶7. Tammy said Harvey continued to choke her and picked her up off the ground by her neck. She felt like she was going to pass out. Harvey let go of her, and she fell to the floor. Harvey then kicked her and told her to get up.

¶8. Harvey put the gun down and told Tammy to follow him out of the bedroom. They walked out of the bedroom and toward the kitchen. When Harvey turned toward the dining room, Tammy ran straight to the door to the garage. Tammy ran outside of the garage and toward Angie Moore's house, which was four houses down. Tammy tripped and fell along the way. She remembered landing on her arm and not being able to get up. She thought Harvey was right behind her at that point and that he was "fixing to blow [her] brains out." She saw that Harvey was not behind her, and she got up and continued to run to Moore's house.

¶9. When Tammy arrived at Moore's house, Moore called the police and told Tammy to hide in her bedroom. Moore then got her neighbor Keith Peoples from across the street to come over. At this point, Tammy was in Moore's bathroom hiding under the vanity. Both Moore and Peoples testified that Tammy's face was swollen and that she had an imprint on her forehead. Moore testified that the imprint looked like the barrel of a gun. Tammy testified that the imprint was from Harvey putting the gun to her forehead.

¶10. The police and paramedics arrived soon after. The police took Harvey into custody. Afterwards, Harvey's sister came over to Moore's house after hearing from Harvey that he and Tammy had gotten into a fight.

3

¶11. The paramedics wanted to take Tammy to the hospital after Tammy told them she did not know if she had ever lost consciousness when Harvey was choking her. Tammy declined to go to the hospital, saying that she just wanted to go home and go to bed.

¶12. Tammy went back to her house where the police interviewed her further. The police called Tammy's brother. When her brother arrived, he took Tammy to the Center for Violence Prevention. While there, Tammy became nauseous and started vomiting. Her brother then took her to the hospital.

¶13. A nurse who treated Tammy testified at trial that Tammy had an abrasion above her right eye and some bruising around both eyes and along her entire jaw line. She said Tammy also had some redness on her neck. Tammy complained of jaw pain and chest pain and said she was experiencing tingling and numbness down her right arm intermittently. Hospital personnel performed some CT-scans and X-rays. They treated Tammy with some pain medication, and she was discharged the next day.

¶14. Photos of Tammy's injuries were submitted into evidence. They included photos taken the same day of the alleged assault and photos taken the next day, two days later, four days later, and five days later.

¶15. Harvey testified that he did not choke Tammy or put a gun to her head. According to Harvey, when he returned from Colorado he first stopped by the hospital where Tammy worked as a nurse. When Tammy came outside to talk to him, she seemed perturbed that Harvey had come to the hospital. When Harvey told her he was going to stop by the house before going out of town again for a planned fishing trip, Tammy asked him why he needed

4

to do that. Harvey asked if there was something at the house she did not want him to see. He said Tammy walked away and "flipped me the bird over her shoulder."

¶16. When Harvey got home, he felt that something was off. He said there was a wet towel lying on their bed, which indicated to him that Tammy "was in a super hurry when she was leaving." There were wet scrubs hanging in the laundry room, and there was an overnight bag lying on the floor that also contained some wet scrubs.

¶17. Harvey then started hearing what sounded like cell-phone notifications. He first thought it was from his phone but nothing was showing. Then he saw Tammy's old phone lying on the night stand next to the bed.

¶18. When he picked it up, he saw several email addresses that he was familiar with, but there was one email address he did not recognize. He clicked on the phone's "iCloud" and then clicked on "Trash," which pulled up numerous messages.

¶19. The first message Harvey saw showed a life insurance policy that Tammy had taken out on him through her work. The benefit amount had been doubled the day Harvey left to go to Colorado a week earlier.

¶20. Harvey told the jury that he takes testosterone and vitamin B-12 shots and that Tammy usually administers the shots. He recalled Tammy giving him a shot right before he left for Colorado which Harvey said felt different than the other shots previously administered. While on the trip to Colorado, Harvey began experiencing what felt like "suffocating" pressure in his chest, and he could not walk more than a few steps without running out of

breath. Harvey was also taking Lasix at the time, and he spent most of the trip inside his hotel room drinking water "to pull the fluid off."

¶21. When Harvey saw the life-insurance email, he was shocked. He thought about the shot that Tammy had given him the week before and about the extreme discomfort he felt while he was in Colorado.

¶22. Harvey pulled up the next deleted message. It was from a girlfriend of Tammy's, which asked, "How's the friend going?" There was a reply from Tammy saying, "He says he's uncomfortable, hahaha, with laughing faces."

¶23. Harvey then pulled up another deleted message, which was under the name "Billy," the same name as Tammy's brother. There were numerous messages under this file between Tammy and a man whose real name, as Tammy later admitted, was Jacob Clack.[2]

¶24. Harvey testified that while he was gathering his thoughts after seeing what was on Tammy's phone, he heard the door to the house open. He was not expecting Tammy home so soon. Harvey heard "a loud clang on the floor," like someone dropped a large jar.

¶25. Harvey said, "Honey, is that you?" Tammy came around the corner and said, "Who the hell else would it be?" Harvey responded, "Well, I don't know. I wasn't expecting you here this early." Tammy responded, "Well, I'm here. You trying to get in my phone?" Harvey replied, "No, ma'am." Tammy asked, "Where is my phone?" Harvey said "Here it is," and he threw it on the bed.

---

[2] Approximately thirty-one pages containing conversations between Tammy and Clack were submitted as evidence during Tammy's testimony at trial.

¶26. Harvey told Tammy she had some explaining to do and asked, "Who is this guy?" Tammy sat down on the edge of the bed and told Harvey that the guy was a patient of hers and that she had started texting him about eight weeks before because she did not think Harvey cared for her anymore. Harvey replied that he had just ceased reacting verbally to Tammy's "smart comments," but he had never stopped loving her.

¶27. Harvey asked Tammy if she was having an affair. Tammy said, "No, no, no, no, no, no, no, I'm not having an affair." Harvey said, "I asked you not to 'F' with me like this. Don't do this to me and you went and done exactly what I've asked you not to do before the day we got married."

¶28. Harvey told the jury that Tammy became combative, saying, "I'm not doing anything. It's just text messages. It's nothing. It's nothing there. [N]othing physical took place. It's nothing at all." At that point, Harvey said to Tammy, "Well, I'm going to let our 20 closest friends decide that and I hit the send button with all the pictures attached of her text messages to Clack."

¶29. According to Harvey, this "ignited" Tammy. She "stood up" on the bed frame "and c[a]me at me. When she did, I just threw up my left hand and that's when I popped her under the eye and she went back on the bed."

¶30. Harvey said to Tammy, "What are you doing?" Tammy responded, "I can't believe you did that. Why would you do that?" Harvey said Tammy "c[a]me back at me again and I palmed her in the chest." When she "c[a]me back" at him a third time, Harvey "palmed her

7

in the chest again. And when I palmed her that time and come back like that, my ring caught her under her chin."

¶31.    Harvey said to Tammy, "What - - what are you doing? I can't believe you did that. And then she's - - she's steady just - - I don't remember what all she's saying, she was just vomiting at me."

¶32.    Harvey said when Tammy "c[a]me back again," he remembered that he had laid his two guns under his bedroom TV. Harvey grabbed his revolver and put in his back pocket, and he "grabbed the 9-millimeter and cleared it." At that point, Tammy reached down and grabbed the gun and said, "Kill me. Just Kill me m***** f*****. If you're going to kill me, just kill me."

¶33.    Harvey told Tammy he was not trying to kill her, but he was not going to let Tammy kill him. "And don't run off telling everybody that I'm trying to kill you and kill your whole family and all that craziness."

¶34.    Harvey said that at this point, Tammy was sitting back on the bed and she said, "It ain't what you think." She said that she had not had an affair. Harvey told Tammy to follow him, "let me show you how I know something's going on."

¶35.    They walked into the laundry room where Harvey "threw the gun up on the drier and grabbed [Tammy's] clothes and said, See these? These are wet." Harvey then said, "I'm going to show you some more." Harvey walked out of the laundry room, and when he got to the hallway, he turned around, and Tammy "had run out the door."

¶36. Harvey was indicted for aggravated domestic violence under Mississippi Code Section 97-3-7(4)(a)(iii) (Rev. 2020) and kidnapping under Mississippi Code Section 97-3-53 (Rev. 2020). Numerous people testified at trial. The jury found Harvey guilty of aggravated domestic violence and not guilty of kidnapping. Harvey appeals his conviction, claiming the trial court prohibited him from presenting relevant defense evidence and erroneously allowed an improper jury instruction regarding prior-bad-act evidence.

## DISCUSSION

### I.     Relevant Defense Evidence

¶37. Harvey argues that impeachment evidence was crucial to his defense because this case involved Tammy's word against his. Tammy had testified that she was a good stepmother to Harvey's children from a prior marriage. Specifically, Tammy testified that she took Harvey's children where they needed to go and retrieved them from school if they got sick. Harvey contends on appeal that in an effort to further his defense that Tammy was untruthful, Harvey sought to introduce testimony from his daughter Kathryn (Tammy's stepdaughter) to counter the "good stepmom" testimony from Tammy that the State had elicited during Tammy's testimony.

¶38. Kathryn, who was fifteen years old at the time of trial, testified for the defense. When Kathryn was asked by defense counsel, "did [Tammy] get the kids to school and to practices and all that?" The State objected, arguing, "it's obvious this should not be admissible." The trial court sustained the objection, stating, "I don't believe this is relevant."

¶39. Afterwards, without objection from the State, defense counsel asked Kathryn her opinion about Tammy's "truthfulness or untruthfulness." Kathryn responded, "She's unfaithful. She's a liar."

¶40. Harvey contends that it is fundamentally unfair and reversible error for the State to present evidence and then for the trial court to deny a defendant the opportunity to counter that evidence. Harvey cites *Williams v. State*, 539 So. 2d 1049, 1051 (Miss. 1989), in which this Court held that the trial court erred by allowing the State's expert, testifying on rebuttal, to give her opinion of an alleged sexual-assault victim's propensity for truthfulness when the defense's expert was precluded from giving his opinion on same subject.

¶41. Harvey also cites *Vaughn v. State*, 759 So. 2d 1092, 1104 (Miss. 1999), in which this Court held that a defendant accused of sexually assaulting an eleven-year-old child was prejudiced by exclusion of character evidence to show the victim had the capacity for untruthfulness.

¶42. Harvey contends that Kathryn's testimony about Tammy was admissible under Rule 404(a)(2)(B) of the Mississippi Rules of Evidence, which allows a defendant to "offer evidence of an alleged victim's pertinent trait[.]" Harvey submits that the "pertinent trait" the defense sought to illustrate was that Tammy was dishonest with the jury, not necessarily whether she was a good stepmother or not. Harvey submits that Kathryn's testimony would have demonstrated that Tammy might have been untruthful in her testimony and would have corroborated other defense testimony that Tammy was dishonest.

10

¶43. "[A] trial judge has considerable discretion as to relevancy and admissibility of evidence and unless this judicial discretion is so abused as to be prejudicial to the accused we will not reverse on these grounds." *Weeks v. State*, 493 So. 2d 1280, 1284 (Miss. 1986) (citing *Shearer v. State*, 423 So. 2d 824, 826 (Miss. 1983)).

¶44. We find no error with the trial court's ruling. At the outset, Harvey did not argue admissibility under Rule 404, and he cannot do so for the first time on appeal. "We cannot hold a trial court in error on a matter not presented to it for a decision." *Ronk v. State*, 172 So. 3d 1112, 1139 (Miss. 2015) (citing *Moawad v. State*, 531 So. 2d 632, 634 (Miss. 1988)). Harvey simply submitted that because Tammy had testified that she would take the kids to "practices, doctor appointments, and school," the defense believed this became a relevant matter in the case.

¶45. Also, the record does not show what Kathryn's testimony would entail. Rule 103(a)(2) of the Mississippi Rules of Evidence requires the substance of the evidence be made known to the trial court by an offer of proof unless the substance is otherwise apparent from the context. *See Vaughn*, 759 So. 2d at 1103 (finding that the threshold test was met by defense counsel's placing in the record that the excluded witness would testify that the victim's reputation for truthfulness was "bad"); *see also Bland v. State*, 355 So. 3d 212, 217 (Miss. 2022) (reiterating that "[w]hen testimony is not allowed at trial, a record of the proffered testimony must be made in order to preserve the point for appeal" (internal quotation marks omitted) (quoting *Green v. State*, 89 So. 3d 543, 554 (Miss. 2012))).

11

¶46.    The substance of Kathryn's testimony was not made known to the trial court.  Thus, we do not know what Kathryn was going to testify in response to Tammy's testimony about taking Harvey's children places they needed to go and retrieving them from school if they got sick.

¶47.    Procedural bars notwithstanding, there is no merit to Harvey's argument on appeal.  First, given that Kathryn was permitted to offer her opinion as to Tammy's character for truthfulness distinguishes this case from *Vaughn*, which this Court reversed because such evidence was excluded.  *Vaughn*, 759 So. 2d at 1104.

¶48.    Second, as will be explained, Kathryn could only provide opinion or reputation testimony as to Tammy's truthful or untruthful character in this instance for purposes of Rule 404(a)(2)(B).

¶49.    Rule 404 governs character evidence and its admissibility.  *Newsom v. State*, 629 So. 2d 611, 613-14 (Miss. 1993).  Rule 405 of the Mississippi Rules of Evidence deals with methods by which character evidence may be proved.  *Id.*

¶50.    The *Newsom* Court explained the two rules in a criminal case in which the defendant sought to introduce, through a defense witness, what the defense claimed was relevant character evidence regarding a homicide victim.  *Id.* at 613.

¶51.    The Court in *Newsom* reiterated that character evidence generally may not be used "to prove action in conformity therewith."  *Id.* (citing MRE Rule 404).  In criminal cases, however, "Rule 404(a)(2) specifically authorizes inquiry by a criminal defendant into a victim's character."  *Id.*  For example, "[t]his exception enables defendants to prove that the

victim was the initial aggressor and that the defendant acted in self-defense." *Id.* (citing MRE 404 cmt).

¶52. The Court in *Newsom* explained that "[o]nce Rule 404 has been satisfied, character evidence in the form of opinion or reputation evidence is admissible without further restriction." *Id.* (citing MRE 405(a)). But, "when character evidence passes through Rule 404(a)(2), and is offered in the form of specific instances conduct, it is admissible only on cross-examination." *Id.* at 613-14 (citing MRE 405(a)).

¶53. Because the defense witness's testimony was offered on direct examination during the defendant's case-in-chief, the *Newsom* Court said that any character evidence in the form of specific instances of conduct "cannot be admitted through Rule 404(a)(2) and 405(a))." *Id.* at 614. It could, however, be admitted independently of Rule 404, through Rule 405(b), which provides that "[w]hen a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct." MRE 405(b); *Id.* The *Newsom* Court reiterated that "past acts are admissible [whether on cross or direct examination] where a defendant alleges self-defense" and "the character trait of violence was an 'essential element' of the defense under 405(b)." *Id.* (quoting *Heidel v. State*, 587 So. 2d 835, 843-47 (Miss. 1991)).

¶54. Here, similar to *Newsom*, Kathryn's testimony was offered on direct examination during Harvey's case-in-chief. Therefore, any character evidence in the form of specific instances of conduct by Tammy could not be admitted through Rule 404(a)(2)(B) in conjunction with Rule 405(a). It could be admissible under Rule 405(b). But the character

trait had to be an essential element of the charge, claim, or defense in the case. MRE 405(b). It was not.

¶55. As Harvey acknowledges on appeal, whether Tammy was a good or bad stepmom is irrelevant. The fact that a bad person or a good person "was murdered or beaten is inconsequential." *Harveston v. State*, 493 So. 2d 365, 373 (Miss. 1986).

¶56. Nor was either party's character for truthfulness or untruthfulness an essential element of the charge or defense in this case. Thus Rule 405(b) is inapplicable. *See* MRE 405(b) advisory comm. n. ("Evidence of specific conduct is limited to cases in which character is an issue."); *see also* MRE 404(a) advisory comm. n. ("Character is straightforwardly introduced into evidence when it is a direct issue. A defamation case exemplifies when character is a direct issue.") (citing *New Orleans Great N. R.R. v. Frazier*, 158 Miss. 407, 130 So. 493 (1930)).

¶57. As mentioned, Kathryn was allowed to give her opinion as to Tammy's character for truthfulness or untruthfulness. Thus, unlike in *Vaughn*, Harvey was in fact allowed to make proof of character under Rule 404(a)(2)(B) as provided by Rule 405(a) and/or Rule 608(a) of the Mississippi Rules of Evidence.[3] It would have been improper, however, to allow Kathryn to provide character evidence in the form of specific instances of conduct by Tammy.

---

³ Rule 608(a) states in part that "[a] witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character."

14

¶58.   *Williams*, the other case Harvey relies on for this issue, is also distinguishable.  There, a psychiatrist who had interviewed a child victim of alleged sexual abuse testified for the defense as to the child's propensity for truthfulness.  *Williams*, 539 So. 2d at 1050.  But the defense expert was not allowed to testify as to the propensity for truthfulness with regard to the victim's brother, whom the expert had also interviewed.  *Id.* at 1050-51.[4]  During rebuttal, however, the State's expert, who had also interviewed both children, was allowed to testify as to her opinion regarding the brother's propensity for truthfulness.  *Id.* at 1051.

¶59.   The *Williams* Court found that this was obvious error.  *Id.* (reiterating that "[t]he purpose of rebuttal testimony is to explain, repel, counteract or disprove evidence by the adverse party"). The Court in *Williams* concluded, without discussion, that given the preclusion of the defense expert's opinion, it was reversible error to allow the opinion of the State's expert in rebuttal on the same subject matter.  *Id.*

¶60.   *Williams* concerned an error that was clearly and unfairly prejudicial to the defendant that may have effected the outcome of the case given that it relied significantly on expert testimony from both parties. *Id.* at 1050-51. That cannot be said here.

¶61.   This case involved primarily "she said/he said" testimony between two adult witnesses, the credibility and truthfulness of which did not involve expert testimony to aid the jury in understanding and resolving the evidence.

¶62.   But even if we were to agree that the State opened the door for Harvey to introduce rebuttal evidence to Tammy's testimony about chauffeuring her stepchildren to and from, the

_____

[4]  The Court noted that the defendant had also been arrested for sexual molestation of the victim's brother, which was a separate case.  *Williams*, 539 So. 2d at 1051 n.1.

matter was so collateral and insubstantial to the actual issues in the case that any error pertaining to the trial court's ruling was harmless beyond a reasonable doubt.

¶63. As the State points out, Tammy admitted that she had an emotional affair with another man and that she took dishonest and deceptive steps to hide it from Harvey. Three defense witnesses testified that they believed Tammy to be an untruthful and dishonest person. Also, Harvey too was allowed to testify that he was a good father and stepfather to his and Tammy's children.

¶64. The jury heard extensive evidence pertaining to the events surrounding the alleged assault, including lengthy and repeated evidence pertaining to Harvey and Tammy's troubled marriage. The trial court gave both sides much leeway with regard to credibility and/or character evidence in this case. And we fail to see how the outcome would have been any different had the trial court allowed rebuttal evidence regarding Tammy's testimony that she took her stepchildren places and retrieved them from school.

¶65. This issue is without merit.

## II. Improper Jury Instruction Regarding Prior Bad Act Evidence

¶66. Tammy was allowed to testify under Rule 404(b) of the Mississippi Rules of Evidence about an alleged incident that occurred in 2018 when Harvey purportedly kidnapped and physically assaulted Tammy after discovering that she had "guy friends" on her Facebook page.

¶67. Pursuant to Rule 105 of the Mississippi Rules of Evidence, the trial court provided the following limiting instruction to the jury:

16

The [c]ourt instructs the jury that acts testified to regarding abuse that occurred before April 15, 2021, between the defendant and Tammy Harvey are acts for the which the defendant is not presently on trial and are to be considered only for the limited purpose of showing proof of motive, intent, common plan or scheme. You cannot and must not simply infer that the defendant acted in conformity with his previous acts and that he is therefore guilty of the charges for which he is presently on trial.

¶68. The State drafted and submitted the instruction to the trial court with no objection from the defense. It was approved by the trial court prior to trial after the trial court ruled that the State would be permitted to present Rule 404(b) evidence. The trial court read the instruction to the jury immediately following the State's direct examination of Tammy and submitted the instruction to the jury for deliberation.

¶69. Harvey claims for first time on appeal that the phrase "regarding abuse that occurred before April 15, 2021," is peremptory or presumptive of Harvey's guilt regarding the prior allegations. Harvey contends that although he admitted to slapping Tammy on one prior occasion, he did not admit that this act constituted abuse or domestic violence.

¶70. Harvey acknowledges that defense counsel did not object to this instruction at trial, but he contends that the instruction constituted plain error that the trial court should have recognized and corrected. Harvey cites *Harrell v. State*, which said that "[i]t is the trial court's responsibility to assure that the jury is 'fully and properly instructed on all issues of law relevant to the case.'" (quoting *Harrell v. State*, 134 So. 2d 266, 270 (Miss. 2014); *Kolberg v. State*, 829 So. 2d 29, 46 (Miss. 2002), *overruled on other grounds by Rowsey v. State*, 188 So. 3d 486, 494 (Miss. 2015)). Harvey claims that by misinforming the jury, his constitutional rights to due process and a fair trial were violated.

17

¶71. "The plain error doctrine is employed only in situations when a 'defendant's substantive or fundamental rights are affected.'" *Green v. State*, 183 So. 3d 28, 31 (Miss. 2016) (quoting *Flora v. State*, 925 So. 2d 797, 811 (Miss. 2006)). It "is properly utilized for correcting *obvious* instances of injustice or misapplied law." *Id.* (internal quotation mark omitted) (quoting *Smith v. State*, 986 So. 2d 290, 294 (Miss. 2008)) To reverse under the doctrine, the error must have "resulted in a manifest miscarriage of justice or 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Hall v. State*, 201 So. 3d 424, 428 (Miss. 2016) (internal quotation mark omitted) (quoting *Brown v. State*, 995 So. 2d 698, 703 (Miss. 2008)).

¶72. We find no error with use of the phrase "regarding abuse that occurred before April 15, 2021." Harvey fails to consider the language, "acts testified to" that immediately preceded it. This is qualifying language which is typically used in limiting instructions dealing with Rule 404(b). For example, in *Gore v. State*, 37 So. 3d 1178, 1184 (Miss. 2010) (alterations in original) (emphasis added), this Court approved the following limiting instruction to the jury:

> [t]he [c]ourt instructs the jury that *acts testified to* by [Daniel] and [Katie] are acts relating to charges for which the defendant is not presently on trial and are to be considered only for the limited purpose of showing proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. You cannot and must not simply infer that the defendant acted in conformity with his previous acts and that he is therefore guilty of the charge for which he is presently on trial.

¶73. The accompanying use of this qualifying language renders the limiting instruction nonperemptory. This is particularly so when considered with the rest of the language in the instruction, as well as another jury instruction given in this case, "Jury Instruction No. 1."

¶74. Jury Instruction Number 1 instructed the jury "not to single one jury instruction alone as stating the law" and "you must consider these instructions as a whole." It also instructed the jury that

> It is your prerogative to determine what weight and what credibility will be assigned to the testimony and supporting evidence of each witness in this case. You are required and expected to use your good common sense and your sound honest judgment in considering and weighing the testimony of each witness who testified.

¶75. The terms abuse or domestic abuse were mentioned repeatedly to the jury in this case, beginning with voir dire questions during jury selection, as well as during both the State's and defense's respective cases-in-chief. Both Tammy and Harvey testified to prior acts that could be considered *abuse* under the ordinary sense of the term. What is important is that the rest of the instruction told the jury that it "[could] not and must not simply infer that the defendant acted in conformity with his previous acts and that he is therefore guilty of the charges for which he is presently on trial."

¶76. While it may have been better to qualify the limiting instruction even further by including the term *alleged* or something similar immediately before the term *abuse*, failure to do so did not result in a manifest miscarriage of justice or seriously affect the fairness of this trial.

¶77. Accordingly, Harvey's claim that this case should be reversed based upon plain error regarding the limiting instruction is without merit.

## CONCLUSION

¶78. We affirm Harvey's conviction of aggravated domestic assault.

¶79. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**